# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Village of Crestwood v. Ironshore Specialty Insurance Co.*, 2013 IL App (1st) 120112

| | |
|---|---|
| Appellate Court Caption | THE VILLAGE OF CRESTWOOD, an Illinois Municipal Corporation and CHESTER STRANCZEK, Individually and as a Former Mayor of the Village of Crestwood, Plaintiff-Appellants, v. IRONSHORE SPECIALTY INSURANCE COMPANY, WESTPORT INSURANCE CORPORATION, and UNITED NATIONAL INSURANCE COMPANY, Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket Nos. 1-12-0112, 1-12-0227 cons. |
| Filed | February 22, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The claims against a village based on allegations that it distributed contaminated well water to its homes and businesses for over two decades were not covered by the village's excess public entity general liability policies, since the absolute pollution exclusion clauses applied. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-49583; the Hon. Mary L. Mikva, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Robert Marc Chemers, Scott L. Howie, Heather E. Plunkett, and Peter G. Syregelas, all of Pretzel & Stouffer, Chtrd., of Chicago, for appellant Village of Crestwood.

Chris C. Gar, John H. Mathias, Jr., Christopher C. Dickinson, and Jason J. Green, all of Jenner & Block, LLP, of Chicago, for appellant Chester Stranczek.

Carlos Del Campo and Mary E. Fechtig, both of Meckler Bulger Tilson Marick & Pearson, LLP, of Chicago, for appellee Ironshore Specialty Insurance Company.

Robert J. Bates, Jr., and Catherine M. Crisham, both of Bates Carey Nicolaides, LLP, of Chicago, for appellee Westport Insurance Corporation.

Edward J. Murphy, of Life Lyons Murphy Nahrstadt & Pontikas, of Chicago, and Lawrence K. Rynning, of Law Offices of Lawrence K. Rynning, of Wheaton, for appellee United National Insurance Company.

Panel

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.

Justices Epstein and Palmer concurred in the judgment and opinion.

## OPINION

¶ 1 Plaintiffs Village of Crestwood, Illinois, and the town's former long-standing mayor, Chester Stranczek (together Village or Crestwood), filed this declaratory judgment action seeking a declaration that three excess public entity general liability insurers owed duties to defend or indemnify against at least 25 individual and class action lawsuits alleging the Village knowingly and routinely mixed cheap, polluted water into the municipal tap water supply in order to cut municipal expenses. The defendant insurers were Westport Insurance Corporation, as successor-in-interest to Coregis Insurance Company (Westport), United National Insurance Company (United National), and Ironshore Speciality Insurance Company, formerly known as TIG Speciality Insurance Company (Ironshore). The circuit court held that the underlying claims fell within absolute pollution exclusion clauses in each of the eight insurance contracts at issue and that this entitled the defendant insurers to summary judgment. The Village appeals, contending the pollution exclusions should have

been limited to claims alleging "traditional environmental pollution," pollution originated by the Village, or pollution exceeding maximum permitted contaminant levels for drinking water; or should not have been applied to claims arising from the Village's "central business activity" of providing municipal tap water.

¶ 2    The Village's practices became the subject of a nine-count civil pleading the Illinois Attorney General filed on June 9, 2009. The Attorney General sought injunctive relief, civil penalties, and costs against the Village, Crestwood's current and former mayors, and Frank Scaccia, who was the certified operator of Crestwood's water supply between 1998 and 2008, due to their failure to comply with laws and regulations enacted for public health and safety such as those requiring accurate reports to regulators and consumers and periodic testing for chemical contaminants. Also, as discussed further below, two of the Village's liability insurers, Scottsdale Indemnity Company and National Casualty Company, filed a coverage action in federal court alleging that pollution exclusions in their contracts precluded coverage for the Village. *Scottsdale Indemnity Co. v. Village of Crestwood*, 784 F. Supp. 2d 988 (N.D. Ill. 2011). Meanwhile, the Village was proceeding in the current state court action against liability insurers Westport, United National, and Ironshore. It appears the federal coverage action and state coverage action proceeded simultaneously without any party seeking stay or removal and consolidation of the actions. Thus, while the federal district court's decision was being reviewed in the Seventh Circuit Court of Appeals, the circuit court of Cook County was entering judgment against the Village, and the Village was initiating the current appeal around the same time the Seventh Circuit Court of Appeals rendered its decision against the Village. *Scottsdale Indemnity Co. v. Village of Crestwood*, 673 F.3d 715 (7th Cir. 2012).

¶ 3    In a motion taken with the case, the three insurers here argue the federal appellate decision triggers the doctrine of collateral estoppel and warrants dismissal of this state court appeal. According to the doctrine of collateral estoppel, a prior adjudication precludes litigation of an issue where (1) the issue decided in the prior case is identical to the one in the pending suit, (2) there was a final judgment on the merits, and (3) the party against whom estoppel is asserted was either a party or in privity with a party in the prior lawsuit. *Kessinger v. Grefco, Inc.*, 173 Ill. 2d 447, 672 N.E.2d 1149 (1996). Even when the threshold elements of the doctrine are met, however, collateral estoppel will not be applied to preclude a party from presenting a defense or claim unless it is clear that no unfairness results to the party being estopped. *Kessinger*, 173 Ill. 2d at 468, 672 N.E.2d at 1158. Here, where the insurers have proceeded in state court without any apparent attempt to stay or remove the action to federal court, we conclude that it would be manifestly unfair to hold that the federal decision precludes further argument in the state courts. Accordingly, we deny the insurers' joint motion to dismiss this appeal on grounds of collateral estoppel.

¶ 4    In an additional motion taken with the case, the Village asks us to strike the insurers' appellate brief. The Village contends it was improper for the insurers to file the motion to dismiss the appeal on collateral estoppel grounds and then file a responsive brief to the appeal. The Village contends that by filing a motion to dismiss, the insurers chose their course of action. The Village's argument is not well-founded. It is not based on any rule of appellate practice. It is based on two federal opinions that are inapposite. In *Ramos v.*

*Ashcroft*, 371 F.3d 948, 949 (7th Cir. 2004), on the date it was supposed to be filing a response brief, the respondent filed a motion to transfer in which it asked to be granted more time to file a brief if the court decided to deny the motion for transfer. The court recognized the tactic to be a self-granted extension, chastised the party, and stated that if the overdue brief was not filed in short order, the matter would proceed on the petitioner's brief alone. *Ramos*, 371 F.3d at 950. When the same dilatory tactic was used in *United States v. Lloyd*, 398 F.3d 978 (7th Cir. 2005), the court reiterated its position: " 'If events justify a last-minute motion concerning jurisdiction, venue, sanctions, or any other subject, then that motion may *accompany* the brief; a motion is not a substitute for a brief.' " (Emphasis in original.) *Lloyd*, 398 F.3d at 981 (quoting *Ramos*, 371 F.3d at 950). The insurers here were not dilatory. The insurers filed their joint motion to dismiss and then timely filed their response brief. Furthermore, although the practice of filing both a motion to dismiss and a brief on the merits is not a common practice, it is a well-established one that is even suggested by the authority the Village relies upon. *Lloyd*, 398 F.3d at 981 (indicating a motion to dismiss may accompany a response brief). See also *Wilson v. Evanston Hospital*, 257 Ill. App. 3d 837, 838, 629 N.E.2d 589, 590 (1994) (in which the defendants' motion to dismiss was taken with the case and addressed prior to the substantive issues); *Perry v. Murtagh*, 278 Ill. App. 3d 230, 232, 662 N.E.2d 587, 589 (1996) (indicating the defendant's motion to dismiss on procedural grounds was denied prior to consideration of the plaintiff's appeal). The Village's motion is denied.

¶ 5        The underlying complaints against the Village assert various theories of liability, such as negligence, fraud, failure to warn, wilful and wanton misconduct, and breach of contract. The pleadings typically allege as follows. Crestwood is a Chicago suburb of approximately 11,000 residents and 550 businesses. Stranczek was Crestwood's mayor between 1970 and 2007, and upon his retirement, he appointed one of his sons, Robert Stranczek, to fill the post. During the senior Stranczek's tenure in 1985 or 1986, the Illinois Environmental Protection Agency (IEPA) notified the Village that a groundwater well the Village was using to supply tap water to the Crestwood community was contaminated with a solvent used in the dry cleaning industry, perchloroethylene or PCE, and other chemicals that occur when PCE breaks down over time. Exposure to these chemicals is linked to human health issues such as cancer, liver damage, and neurological impairment. None of these chemicals occurs naturally in the environment. Some plaintiffs have specified that the likely source of the toxins was a dry cleaning business located within several hundred feet of the well. Although the IEPA told the Village it could no longer use the affected well except in emergencies and the Village responded that it would stop distributing water from the well, the Village subsequently began to routinely mix polluted well water with treated Lake Michigan water it purchased from the neighboring community of Alsip and then supply the polluted combination as the community's tap water. Also, the Village allowed a private firm that was investigating the dry cleaning firm to take samples from the municipal well and was informed in mid 1998, along with the IEPA, that this additional sampling detected contamination. Nevertheless, the Village used the well to provide up to 20% of the community's tap water in any given month, as a cost-saving measure. The Village continued this secret practice for at least two decades. Because the well was reportedly not in use, the

Village also avoided the expenses of periodically testing it for contaminants. The federal Safe Drinking Water Act (42 U.S.C. § 300f *et seq.* (1976)) required the Village to annually issue water quality reports to its customers, and in the Village's "consumer confidence reports," it falsely stated that 100% of the water it was supplying was treated Lake Michigan water. The Village ended its practice of mixing and distributing the contaminated well water and falsely reporting to the contrary only after an anonymous tip led federal regulators to shut down the well in 2007. IEPA sampling in October 2007 revealed vinyl chloride levels at 5.41 parts per billion, which one of the tort plaintiffs characterized as "more than twice the legal limit for drinking water." Another plaintiff alleged the IEPA threshold for vinyl chloride or PCE in tap water was actually "zero or none." Although they diverged on the specific figures, the various plaintiffs were united in their allegations that "government authorities had found [Crestwood's tap water] to be contaminated with unacceptable levels of dangerous chemicals," the demonstrated level of toxins exceeded "the legal limit[s] for drinking water," the tap water "was unsafe for ordinary use and consumption," or, simply, the tap water contained "unwanted and unhealthy levels of dangerous toxins." The plaintiffs alleged they were estate representatives or resided or worked in Crestwood themselves for some or all of the years the Village engaged in the dangerous practices and that the exposure to chemical contamination caused and will continue to cause death, cancer and other illness and other injuries.

¶ 6     In addition to suing the Village for knowingly mixing and distributing contaminated well water with purchased lake water and misrepresenting the source of what flowed from Crestwood's taps, some of the plaintiffs added claims against the dry cleaning business, its owners and employees, and the property owners. The Village focuses its appellate arguments on allegations lodged against these latter defendants, such as the counts brought by plaintiff Earley and plaintiff Jackowiak indicating that the dry cleaning business or its agents negligently allowed chemicals to seep into the groundwater, failed to tell employees how to use hazardous dry cleaning chemicals without endangering the community, and then failed to notify the community of or remediate the contamination that was known to have occurred.

¶ 7     During the years the Village was engaging in these practices, it was also purchasing public entity general liability insurance. According to the defendant insurers here, their policies provide excess coverage to the Village for various years beginning as early as October 1, 1989, and as late as October 1, 1993, and require the Village to exhaust the limits of underlying policies and/or self-insured retentions. According to the Village, the policies provide excess or umbrella coverage and include "step-down provisions providing for a duty to defend the Village as if the policies are primary." Regardless, it is undisputed that each of the subject policies contains an exclusion for pollution claims, that if the claims are excluded from coverage there are no duties to defend or indemnify, and that the circuit court's ruling on appeal was limited to the meaning of the exclusion clauses.

¶ 8     Unless a statute or rule of law or public policy mandates or prohibits certain terms or provisions, insurers may include in their policies whatever terms they deem appropriate and may choose to cover some risks while excluding others. See, *e.g.*, *Rich v. Principal Life Insurance Co.*, 226 Ill. 2d 359, 875 N.E.2d 1082 (2007) (determining it was not against public policy for a disability insurance policy to limit benefits by excluding injury and

sickness and treatment or surgery for those conditions). Absolute pollution exclusions eliminate coverage for injury or damage for a wide variety of claims. The specific theory under which the insured is being sued is irrelevant; if injury or damage arose out of the discharge of a pollutant, the exclusion is applied as written. Allan D. Windt, 3 Insurance Claims and Disputes § 11:11 (5th ed. 2007); see, *e.g.*, *Economy Preferred Insurance Co. v. Grandadam*, 275 Ill. App. 3d 866, 871, 656 N.E.2d 787, 790 (1995) (rejecting argument that exclusion did not apply because the underlying complaint alleged negligence and negligence was covered).

¶ 9        The exclusion clauses at issue here differ slightly from each other but not in any material way. The policy issued by defendant Ironshore for the October 1, 1992-93 period expressly excludes coverage for " 'bodily injury or property damage' which would not have occurred in whole or part but for the actual alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time." The Ironshore policy defines the term "pollutants" to mean "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste."

¶ 10       This exclusion is known as an "absolute" pollution exclusion, because insurance policies are no longer being written to provide an exception for releases of pollutants that are sudden and accidental. *Grandadam*, 275 Ill. App. 3d at 869, 656 N.E.2d at 789. From the perspective of the insurance industry, courts were straining to find that events were "sudden and accidental" and, therefore, covered, and the industry was coping with enormous expense and exposure from an " ' "explosion" of environmental litigation.' " *Grandadam*, 275 Ill. App. 3d at 870, 656 N.E.2d at 789 (quoting *Vantage Development Corp. v. American Environment Technologies Corp.*, 598 A.2d 948, 952-53 (N.J. Super. Ct. Law Div. 1991).

¶ 11       The defendant insurance companies moved for summary judgment on the basis of their absolute pollution exclusions. After full briefing and oral argument, the circuit court judge granted the request. This appeal by the Village followed.

¶ 12       Summary judgment is properly granted where the pleadings and any depositions transcripts, admissions, and affidavits on file, when viewed in a light most favorable to the nonmoving party, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2010). The interpretation of an insurance policy is a question of law that is appropriately resolved in a summary judgment proceeding. *Rich*, 226 Ill. 2d at 370-71, 875 N.E.2d at 1089. A reviewing court addresses the entry of summary judgment and the interpretation of an insurance policy *de novo*. *Rich*, 226 Ill. 2d at 370-71, 875 N.E.2d at 1089. Our task is to determine whether the policies' absolute pollution exclusions preclude coverage for the numerous complaints alleging the Village knowingly mixed contaminated water into Crestwood's public water supply. *Rich*, 226 Ill. 2d at 379, 875 N.E.2d at 1094 (an exclusion takes out a person or event otherwise included within the scope of coverage); *Hartford Accident & Indemnity Co. v. Case Foundation Co.*, 10 Ill. App. 3d 115, 124, 294 N.E.2d 7, 14 (1973) ("Exclusions in an insurance policy have relevance only when there is coverage.").

¶ 13       The Village first argues the exclusions are properly limited to claims alleging "traditional environmental pollution" as that phrase was used in *American States Insurance Co. v.*

*Koloms*, 177 Ill. 2d 473, 1187 N.E.2d 72 (1997). According to the Village, *Koloms* determined the underlying complaints must depict the Village as an "active polluter" or an entity that could be required to pay governmental clean-up costs pursuant to an environmental law such as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, which is commonly known as CERCLA or the Superfund Act. 42 U.S.C. § 9601 *et seq.* (1980). The Village argues the lawsuits indicate the only "actual polluter" or entity that might be accountable for environmental cleanup is the nearby dry cleaning business and that the Village is depicted as merely the passive, negligent distributor of a product (tap water). The Village emphasizes that when an exclusion is relied on to deny coverage, its applicability must be clear and free from doubt because any uncertainty must be resolved in favor of the insured. *Rich*, 226 Ill. 2d at 371-72, 875 N.E.2d at 1090.

¶ 14        The Village acknowledges that its interpretation of *Koloms* has already been rejected in the recent federal court declaratory judgment action concerning the duties of some of the Village's other liability insurers for the underlying claims. In *Scottsdale Indemnity*, 673 F.3d 715, the Seventh Circuit Court of Appeals discussed *Koloms* and the rationale for excluding "traditional environmental pollution" from liability insurance coverage. The court remarked that a "more perspicuous formula than 'traditional environmental pollution' would be 'pollution harms as ordinarily understood.' " *Scottsdale Indemnity*, 673 F.2d at 717. The court was attempting to make the dry insurance contract terminology more easily understood, but the Village contends the remark was actually a rewrite of *Koloms*' holding, in violation of the principle that a federal court sitting in diversity applies state court precedent as it would be applied in the state court. See *Help at Home, Inc. v. Medical Capital, L.L.C.*, 260 F.3d 748, 753 (7th Cir. 2001) ("It is our duty to apply the law that we believe the Supreme Court of Illinois would apply if the case were before this tribunal rather than before this court."). The Village also acknowledges that the federal court rejected the Village's self-portrayal as a nonpolluter that negligently sold a defective product. The Village contends the Seventh Circuit Court of Appeals reached this result only by using "powers of clairvoyance to decide that Village officials *intentionally* distributed contaminated water" and, thus, the court improperly prejudged an issue which should be addressed in the underlying litigation. (Emphasis in original.) See *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 940 N.E.2d 1011 (2010) (in a declaratory judgment action, the court may look beyond the underlying complaint, but should not consider evidence that tends to determine an issue crucial to the underlying action).

¶ 15        In *Koloms*, a malfunctioning furnace spread carbon monoxide fumes throughout a two-story commercial property in Lincolnshire, Illinois, causing six tenants who inhaled the noxious air to become ill. *Koloms*, 177 Ill. 2d at 476, 687 N.E.2d at 74. When the tenants filed suit, the insurer of the building declined to provide a defense, arguing coverage was precluded by a standard-form absolute pollution exclusion. *Koloms*, 177 Ill. 2d at 477, 687 N.E.2d at 74. Like the exclusions at issue here, the *Koloms* exclusion barred coverage for the "discharge, dispersal, release or escape" of "pollutants" and defined "pollutants" to encompass any gaseous "irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Internal quotation marks omitted.) *Koloms*, 177 Ill. 2d at 487, 687 N.E.2d at 78-79. The insured/building owner argued the insurer was reading its

exclusion language too broadly and that history indicated the clause was intended to protect insurers from having to defend and indemnify insureds in connection with governmental clean-up costs of large scale, industrial, or commercial contamination. *Koloms*, 177 Ill. 2d at 483-84, 687 N.E.2d at 77. The insured contended that because the noxious fumes inside the commercial building were not pollution in the "traditional" sense of the word, they were not properly excluded. *Koloms*, 177 Ill. 2d at 484, 687 N.E.2d at 77.

¶ 16    The trial and appellate courts agreed with the insured. The appellate court said it was "troubled" by the "overbreadth" of the insurer's interpretation and its attempt to exclude bodily injuries resulting from an event which had "nothing to do with 'pollution' in the conventional, or ordinary, sense of the word." *Koloms*, 177 Ill. 2d at 488, 687 N.E.2d at 79. The court reviewed cases considering the exclusion in the context of carbon monoxide, floor sealants, cleaning compounds, insecticides, and so forth. *Koloms*, 177 Ill. 2d at 485-88, 687 N.E.2d at 78-79. Precedent showed that the predominant motivation for drafting the exclusion had been to avoid the "enormous expense and exposure resulting from the 'explosion' of *environmental* litigation." (Emphasis in original.) (Internal quotation marks omitted.) *Koloms*, 177 Ill. 2d at 492, 687 N.E.2d at 81 (quoting *Weaver v. Royal Insurance Co. of America*, 674 A.2d 975, 977 (N.H. 1996)). Accordingly, the court held that the "pollution exclusion has been, and should continue to be, the appropriate means of avoiding ' "the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances *into the environment*." ' " (Emphasis in original.) *Koloms*, 177 Ill. 2d at 494, 687 N.E.2d at 81 (quoting *West American Insurance Co. v. Tufco Flooring East, Inc.*, 409 S.E.2d 692, 699 (N.C. Ct. App. 1991), quoting *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.*, 340 S.E.2d 374, 381 (N.C. 1986)). See also Jeffrey W. Stempel, *Reason and Pollution: Correctly Construing the 'Absolute' Exclusion in Context and in Accord With Its Purpose and Party Expectations*, 34 Tort & Ins. L.J. 1, 29-32 (1998) (indicating the absolute pollution exclusion was designed to eliminate coverage for gradual environmental degradation and cleanup). The court concluded that the accidental release of carbon monoxide fumes that were kept within the interior of the small commercial building were not the " ' "discharge, dispersal, release, or escape" of a pollutant *** into the environment' " and did not trigger the exclusion from liability coverage. *Koloms*, 177 Ill. 2d at 494, 687 N.E.2d 81-82 (quoting *Tufco*, 409 S.E.2d at 700).

¶ 17    *Koloms*' holding was subsequently applied in *Kim v. State Farm Fire & Casualty Co.*, 312 Ill. App. 3d 770, 772, 728 N.E.2d 530, 531-32 (2000), where a dry cleaning machine malfunctioned, releasing cleaning solvent onto the floor and into the soil underneath the building. Here, the discharge of the hazardous substance was not confined within the building. The event met the definition of traditional environmental pollution in part because the chemical solvent (pollutant) escaped into "the land, atmosphere, or [a] watercourse or body of water." *Kim*, 312 Ill. App. 3d at 774, 728 N.E.2d at 534 (citing *Koloms*, 177 Ill. 2d at 494, 687 N.E.2d at 81-82). Thus, the cleaning company's resulting injuries, such as the costs of replacement equipment, the new floor, the remediation expenses, and lost profits, were excluded by the absolute pollution exclusion. *Kim*, 312 Ill. App. 3d at 775, 728 N.E.2d at 534.

¶ 18    *Grandadam*, although it predated *Koloms* and *Kim*, also supports the conclusion that

traditional environmental pollution occurs when hazardous material is discharged into the land, atmosphere, or water. *Grandadam*, 275 Ill. App. 3d 866, 656 N.E.2d 787. The insured's minor son took a container of mercury from his house to the Grandadam's house, where he " 'spilled *** and scattered [the toxic material] about the interior of the residence.' " *Grandadam*, 275 Ill. App. 3d at 868, 656 N.E.2d at 788. The alleged injuries to the occupants and damage to the Grandadam's home were not covered by his parent's homeowners and personal liability insurance, because the insurance policy included the absolute pollution exclusion. *Grandadam*, 275 Ill. App. 3d at 873, 656 N.E.2d at 791. See also *Housing Authority Risk Retention Group, Inc. v. Chicago Housing Authority*, 378 F.3d 596, 606 (7th Cir. 2004) (absolute pollution exclusion barred coverage for injuries "by hazardous materials that were 'introduced, released and allowed to remain in the environment in Altgeld Gardens [public housing property] by the surrounding industrial plants, abandoned factories, toxic waste dumps, landfills and a Metropolitan Sanitary District plant,' [citation], and by PCBs and PAHs that CHA introduced, released, and allowed to remain in the environment in Altgeld Gardens"); *Legarra v. Federated Mutual Insurance Co.*, 42 Cal. Rptr. 2d 101, 103 (Cal. Ct. App. 1995) (absolute pollution exclusion barred coverage for remediating gasoline contamination of groundwater by petroleum bulk plant).

¶ 19     *Koloms* and the other cases make clear that the Village's knowing contamination of the Crestwood water supply with chemical-laden groundwater and subsequent distribution of that contaminated combination to the community is a textbook example of "traditional environmental pollution." It is undisputed that the chemicals in the Crestwood water supply were contaminants or pollutants as those terms were used in the insurance policies at issue. The policies define "pollutants" as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste material." In addition, this court has previously held that "[a] common understanding of a pollutant is a substance that 'pollutes' or renders impure a previously unpolluted object, as when chemical wastes leach into a clean water supply." *Insurance Co. of Illinois v. Stringfield*, 292 Ill. App. 3d 471, 476, 685 N.E.2d 980, 983 (1997). See also *Great American Insurance Co. of New York v. Helwig*, 419 F. Supp. 2d 1017 (N.D. Ill. 2006) (absolute pollution exclusion applied to claims alleging contamination of groundwater with PCE and trichloroethylene). The PCE and other chemicals that were knowingly dispersed into the Crestwood tap water supply were "pollutants" as that term has been defined by the policies and the Illinois courts. The Village mistakenly relies on *Keggi v. Northbrook Property & Casualty Insurance Co.*, 13 P.3d 785 (Ariz. Ct. App. 2000), which involved naturally occurring coliform bacteria in the water system of an Arizona golf course and on *Covington Township v. Pacific Employers Insurance Co.*, 639 F. Supp. 793 (M.D. Penn. 1986), which involved giardia parasites in municipal water rather than a "pollutant" as that term is commonly understood and defined by the policies at issue. All of the underlying complaints against the Village are based on its contamination of the municipal tap water supply with "pollutants" and thus are within the scope of the exclusion.

¶ 20     We find no indication in the exclusion itself or in precedent that the exclusion is limited to clean-up costs imposed by environmental laws such as CERCLA. 42 U.S.C. § 9601 *et seq.* (1980). It may be true that the exclusion was originally incorporated into liability contracts

to protect insurers from the "yawning expanse of liability" imposed by environmental remediation laws (see generally *Koloms*, 177 Ill. 2d 473, 687 N.E.2d 72), but the exclusion is unqualified and absolute and entirely precludes coverage for bodily injuries or property damage arising out of the discharge, dispersal, release, or escape of pollutants. The underlying complaints allege bodily injuries or property damage arising out of the Village's discharge, dispersal, or release of pollutants into the community's tap water. The exclusions at issue apply to those claims.

¶ 21    Furthermore, we reject the Village's attempt to portray itself as merely a negligent distributor of groundwater contaminated by another entity. For one thing, the Village fails to cite any portion of the record that supports its characterization as an unwitting actor. Even the Gannon complaint, which includes a "Negligence" count against the Village and its officials, states the defendants "a. Mixed contaminated carcinogenic water from Well 1 with Lake Michigan water and provided, supplied or sold that water to Plaintiffs for consumption or use, *knowing that water* from Well 1 was not properly tested or treated and that it *had been found to contain VOCs or other harmful contaminants when it was last tested ***.*" (Emphasis added.) We agree with the observation of the Seventh Circuit Court of Appeals:

"Initially the contamination *** was confined to the groundwater drawn by the well. But by distributing the water to the residents of Crestwood the Village *caused* the *** [toxic chemicals] to migrate throughout the Village and inflict (or so it is alleged) widespread personal injuries, along with contamination of soil or structures that is likely to be costly to eliminate. ***

The Village '*caused*' the contamination of its water supply (it could have sealed the well a quarter of a century ago, when it discovered the well was contaminated) in a perfectly good sense of the word ***." (Emphases added.) *Scottsdale*, 673 F.3d at 720.

The Village contends these remarks indicate the court was prejudging an underlying issue, but in our opinion, the remarks accurately describe the allegations that are pending against the Village. Furthermore, we reiterate that an absolute pollution exclusion is not limited to intentional torts or any other particular theory of liability. The underlying complaints assert a variety of legal theories, but according to the policies, the exclusion is triggered by the facts or "occurrence" of bodily injury or property damage by pollutants. The clause excludes liability for harm resulting from the dispersal or release of pollutants, not their creation or their original distribution.

¶ 22    The Village relies heavily on *Doerr v. Mobil Oil Corp.*, 2000-0947 (La 12/19/00), 774 So. 2d 119, in which the Louisiana Supreme Court adopted that jurisdiction's test for determining the applicability of a "total" pollution exclusion. The claims at issue in *Doerr* arose out of a "hydrocarbons discharge" by a petroleum refinery into the Mississippi River in January 1998 and the contaminants were then unknowingly drawn into the water treatment system of St. Bernard Parish and distributed through the local tap water supply over a period of several days. *Doerr*, 2000-0947, at 1 (La. 12/19/00); 774 So. 2d at 122. The Village does its best to persuade us that *Doerr* is consistent with *Koloms* and involves "strikingly similar facts." However, we are bound to follow the test set out by our own state supreme court in *Koloms* and we do not consider the short-term spill that occurred in Chalmette, Louisiana,

to even remotely resemble what is alleged to have occurred in Crestwood. There is no question that the Village is accused of knowingly adulterating treated Lake Michigan water with contaminated well water and dispersing that polluted tap water to Crestwood homes and businesses for more than two decades.

¶ 23    We also reject the Village's contention that the pollution exclusions do not apply when alleged emissions are within permitted legal standards, even where the insured is an active polluter. The Village is arguing that the contaminant levels were below the maximum amounts permitted by the Safe Drinking Water Act (42 U.S.C. § 300f *et seq.* (1976)) or other environmental regulations. The Village, however, did not have a permit to distribute any water from the contaminated well. The facts do not support the Village's contention.

¶ 24    Finally, the Village is arguing that its liability insurance coverage would be meaningless if it did not encompass its "central business activity" of distributing municipal tap water. The Village bases this argument on *Tufco*, 409 S.E.2d 692. We fail to comprehend how the Village could take advantage of the "central business activity" concept when it is not the Village's central business activity to work with the chemicals that contaminated the well. Moreover, in *Koloms*, the Illinois Supreme Court discussed the *Tufco* decision, but did not adopt its holding, and we are not persuaded to adopt it here.

¶ 25    For these reasons, the circuit court's ruling against the Village and in favor of the insurers is affirmed.


¶ 26    Affirmed.