# Illinois Official Reports

## Appellate Court

---

### *Allstate Indemnity Co. v. Hieber*, 2014 IL App (1st) 132557

---

| | |
|---|---|
| Appellate Court Caption | ALLSTATE INDEMNITY COMPANY, Plaintiff-Appellee, v. LOUISE HIEBER, Special Administrator of the Estate of Holly Hieber, Deceased, Defendant-Appellant (Osvaldo Salazar, Manuel Salazar, and Graciela Salazar, Defendants). |
| District & No. | First District, Third Division<br>Docket No. 1-13-2557 |
| Filed | December 17, 2014 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CH-40559; the Hon. LeRoy Martin, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | O'Connor Law Group, LLC, of Chicago (Bryan J. O'Connor, Jr., of counsel), for appellant.<br><br>Morse, Bolduct & Dinos, LLC, of Chicago (Peter C. Morse and Cynthia Ramirez, of counsel), for appellee. |

| Panel | JUSTICE MASON delivered the judgment of the court, with opinion. Presiding Justice Pucinski concurred in the judgment and opinion. Justice Hyman dissented, with opinion. |
| --- | --- |

**OPINION**

¶ 1     The trial court granted plaintiff Allstate Indemnity Company summary judgment, holding that it is not required to defend or indemnify Osvaldo Salazar, Manuel Salazar, and Graciela Salazar for an accidental shooting that took the life of Holly Hieber. Defendant Louise Hieber, as special administrator of her daughter's estate, appeals. We agree with the trial court that an exclusion in Allstate's policy of homeowners insurance applies and, therefore, affirm.

¶ 2                                    BACKGROUND

¶ 3     Allstate issued a homeowners policy to the Salazars effective March 2011. In that policy, Allstate agreed, in relevant part, to "pay damages which an insured person becomes legally obligated to pay because of bodily injury *** arising from an occurrence." The policy defines an "occurrence" as "an accident" resulting in bodily injury. The policy also contains the following exclusion:

> "We do not cover any bodily injury or property damage intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of, any insured person. This exclusion applies even if:
>
> (a) Such insured person lacks the mental capacity to govern his or her conduct;
>
> (b) Such bodily injury or property damage is of a different kind or degree than intended or reasonably expected; or
>
> (c) Such bodily injury or property damage is sustained by a different person than intended or reasonably expected.
>
> This exclusion applies regardless of whether or not such insured person is actually charged with, or convicted of a crime."

¶ 4     The following facts are taken from the record in the criminal case against Osvaldo Salazar.

¶ 5     On July 10, 2011, Brittany Garcia spent the day with her friends at the beach, including Hieber, Osvaldo, Heather Davis, and Oscar Barragan. At the beach they drank beer, took Xanax and smoked marijuana. They returned to Osvaldo's house after purchasing more beer and hung out in the garage. Osvaldo pulled out a .25-caliber semiautomatic handgun–which he had purchased on the street–to show to his male friends. He pulled back the slide on the top of the gun while displaying it to ensure that it was loaded.

¶ 6     Davis told Osvaldo to put the gun away before he hurt somebody because it had been pointing toward her as he showed it off. Osvaldo put the gun away in the garage, but took it out again later to show off to other friends who showed up. Osvaldo gave the gun to Barragan to hold. Barragan took the magazine out and saw there were bullets in it. He held the gun and magazine for a while, then put the magazine back in and returned the gun to Osvaldo. Barragan did not recall if the safety was on when he returned the gun to Osvaldo.

¶ 7 Someone approached Hieber to see if she wanted to go get a keg of beer and buy more marijuana. Hieber agreed. At that point, Hieber, Osvaldo, and Barragan were the only people in the garage. Hieber turned around to leave and Osvaldo's gun discharged. Hieber lay on the floor of the garage, shot and bleeding from her head, the gun in Osvaldo's hand. No one saw how Osvaldo was holding the gun or what he was doing with it when it discharged. Osvaldo ran from the scene and hid the gun farther down the alley about five houses away. When police arrived, Osvaldo and the others initially told them Hieber had been shot in a drive-by shooting. When the spent casing was located under Hieber's body, police suspected the story was not true. While in custody, Osvaldo admitted that he accidently shot Hieber, who died the next day. Osvaldo later took police to the location in the alley where he had hidden the gun. The gun had one live round in the chamber and four live rounds in the magazine.

¶ 8 The State charged Osvaldo with four crimes, including involuntary manslaughter. 720 ILCS 5/9-3(a) (West 2010). A person commits the offense of involuntary manslaughter "if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." *Id.* After a bench trial, the court found Osvaldo guilty as charged. Specifically, the court found that Osvaldo had been drinking and decided to show off his handgun to his friends:

"I can think of few things more reckless, careless, wanton and brazen than *** to take a loaded gun among intoxicated people and start waving it around."

¶ 9 In 2012, Hieber's estate filed a complaint against the Salazars, alleging that Osvaldo negligently handled the gun and that Osvaldo's parents (Manuel and Graciela) negligently stored the gun and allowed Osvaldo access to it. The Salazars tendered the claim to Allstate. Allstate filed a declaratory judgment action against Hieber's estate and the Salazars, seeking a declaration that it was not obligated to defend or indemnify the Salazars in the underlying action. The trial court granted summary judgment to Allstate, finding that the exclusion in Allstate's policy for bodily injury reasonably expected to result from the insured's criminal acts applied and, therefore, Allstate was not obligated to defend or indemnify the Salazars in the underlying suit. Hieber's estate appealed.

¶ 10 STANDARD OF REVIEW

¶ 11 Summary judgment is appropriate where the pleadings, depositions, admissions, and affidavits–when construed against the moving party–show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Indian Harbor Insurance Co. v. MMT Demolition, Inc.*, 2014 IL App (1st) 131734, ¶ 25. We review the grant of summary judgment *de novo*. *Id.* ¶ 26.

¶ 12 ANALYSIS

¶ 13 Courts interpret insurance policies as contracts and give effect to the parties' intentions as expressed in the policy. *American Family Mutual Insurance Co. v. Jeris*, 376 Ill. App. 3d 1070, 1072-73 (2007). We apply clear and unambiguous terms according to their plain meaning, while ambiguous terms should be construed against the insurer. *Id.* at 1073.

¶ 14 As noted above, Allstate's policy excludes coverage for bodily injury "intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of, any insured person." The plain meaning of this provision excludes coverage in two

circumstances. First, coverage is excluded when the insured intended to inflict bodily harm. *Allstate Insurance Co. v. Brown*, 16 F.3d 222, 225 (7th Cir. 1994). The record in the criminal trial makes clear that Osvaldo did not intend to injure or kill Hieber. See *Aetna Casualty & Surety Co. v. Freyer*, 89 Ill. App. 3d 617, 620 (1980) (defining "intent" in exclusionary clause as desiring consequences of an act or believing that the consequences are substantially certain to occur). As such, coverage is not excluded under the intended-injury part of the exclusion.

¶ 15    As to the second part of the exclusion, the policy inquires whether the bodily injury was such that it "may reasonably be expected to result from the intentional or criminal acts or omissions of, any insured person." As it applies here, the exclusion precludes coverage where the injury is the reasonably expected result of the insured's criminal act. Our inquiry into the "act" portion of the exclusion is simple. Because Osvaldo was convicted after trial of involuntary manslaughter, under any definition of the word, Osvaldo's act of handling the gun was "criminal." See Black's Law Dictionary 430 (9th ed. 2009) ("Having the character of a crime; in the nature of a crime ***."); Webster's Third New International Dictionary 536 (1993) ("involving or being a crime"). The only issue then is whether it can be said that Hieber's injury could reasonably be expected to result from Osvaldo's criminal act.

¶ 16    Allstate first argues that Osvaldo's criminal conviction collaterally estops Hieber's estate from contending that Hieber's death was not the reasonably expected result of Osvaldo's criminal act. In support, Allstate cites *American Family Mutual Insurance Co. v. Savickas*, 193 Ill. 2d 378 (2000). In *Savickas*, the insured shot and killed a man and was convicted of first degree murder. *Id.* at 380. At the insured's criminal trial, he "admitted that the gun did not go off accidentally" and "that he intentionally pointed the gun at the decedent and intentionally pulled the trigger while the gun was so aimed." *Id.* at 382. The victim's estate sued the insured for wrongful death, and the insured tendered the claim to his homeowners insurance carrier. *Id.* at 380-81. The insurance company filed a declaratory judgment action, alleging no coverage, and the trial court granted summary judgment as the policy excluded coverage for injury " 'which is expected or intended by any insured.' " *Id.* at 381.

¶ 17    Our supreme court held that the insured's criminal conviction constituted conclusive proof of the facts on which it was based, including the insured's intent, and that collateral estoppel precluded relitigation of those issues in the declaratory judgment action. *Id.* at 387. Expressly overruling the holding of *Thornton v. Paul*, 74 Ill. 2d 132, 151 (1978), which found that a criminal conviction was only *prima facie* evidence and not conclusive proof of the facts underlying the conviction, the *Savickas* court, following the trend in the vast majority of jurisdictions, held that a criminal conviction collaterally estops the retrial of issues in a later civil trial that were actually litigated in the criminal trial. *Savickas*, 193 Ill. 2d at 384. The court reasoned that the heightened burden of proof applicable in criminal cases, as well as the substantial rights afforded criminal defendants, including the right to remain silent and the State's inability to comment on that silence, weighed in favor of according estoppel effect to criminal convictions. *Id.* at 385-86. The court further found that the traditional elements of collateral estoppel–identity of issues, identity of parties and a final judgment on the merits–were all satisfied in the context of Savickas's criminal conviction: (i) a determination of Savickas's mental state, *i.e.*, that he either intended the victim's death or knew that his acts created a strong probability of death or great bodily harm, was necessary to his conviction; (ii) Savickas was a party to both cases; and (iii) Savickas litigated the issue to verdict and through appeal and thus there was a final adjudication on the merits. *Id.* at 388-89. Finally, because the

- 4 -

rights of the victim's estate against the insurer were wholly derivative of Savickas's rights under the policy, the estate was bound to the result of the criminal trial as well. *Id.* at 392-93.

¶ 18    Hieber's estate urges us to apply *Savickas* in the same way the appellate court applied the collateral estoppel doctrine to a crime of recklessness in *Metropolitan Property & Casualty Insurance Co. v. Pittington*, 362 Ill. App. 3d 220 (2005). In *Pittington*, the insured discharged a shotgun, injuring a person. *Id.* at 222. The insured was charged with attempted murder, aggravated battery with a firearm, and unlawful possession of a firearm without a firearm owner's identification card, but he accepted a deal and pled guilty to reckless conduct (720 ILCS 5/12-5 (West 2000)). *Pittington*, 362 Ill. App. 3d at 222. The injured person filed suit against the insured, who tendered the defense to Metropolitan, his homeowners insurance carrier. *Id.* The policy excluded coverage for injury that " 'may reasonably be expected to result from' " the criminal acts of the insured. *Id.* at 224. Based on the preclusive effect of the insured's guilty plea, Metropolitan was granted summary judgment. *Id.* at 222-23.

¶ 19    The appellate court reversed in part, holding that the insured's plea had no preclusive effect in the insurance coverage case. *Id.* at 227-28. The court reasoned that the issues in the criminal case where not identical to those in the insurance case: "In pleading guilty to reckless conduct, [the insured] admitted he performed an act that caused the harm or endangered the safety of [the injured claimant] with 'conscious disregard' of a substantial and unjustifiable risk. [Citation.] [The insured's] plea is in no way an admission that he expected, anticipated or intended to cause bodily harm to [the injured claimant] and, therefore, cannot meet the first part of the *Savickas* estoppel test." *Id.* at 227. Further, the court found that in the context of a criminal trial in which the insured, if convicted, faced a sentence of 31 years to natural life, the State's offer mid-trial to allow the insured to plead guilty to the misdemeanor charge of reckless conduct rendered the criminal proceedings a " 'side show,' " which would preclude any rulings or admissions from being afforded preclusive effect in the civil suit. *Id.*

> "The 'practical realities' of [the insured's] criminal litigation were such that when offered the chance to plead to misdemeanor reckless conduct, he had little incentive to continue the litigation in a 'struggle to the finish.' [Citation.] Even an innocent defendant would have to be of stout heart to reject such an offer." *Id.* at 228.

¶ 20    We believe this case is more analogous to *Savickas* than *Pittington*. Here, Osvaldo elected to go to trial on the charge of involuntary manslaughter. There is no dispute that the judgment of conviction entered after trial constituted a final determination on the merits and that Osvaldo, as a party to both cases, and derivatively, Hieber's estate, are the same parties for purposes of collateral estoppel. The only issue then is whether the state of mind necessary to Osvaldo's criminal conviction presents the same issue implicated by Allstate's policy exclusion. We can find no meaningful distinction between the two.

¶ 21    In connection with Salazar's criminal trial, the trial court found that he acted with the requisite intent in that he "purposely went and got a gun and brought it to a party" and that "he knew at the beginning that he committed an inexcusable act of recklessness causing the death of Holly Hieber." Under the Criminal Code of 1961,[1] involuntary manslaughter has three elements: (i) an unintentional killing without lawful justification; (ii) the defendant acts in such a way likely to cause death or great bodily harm to someone; and (iii) acts are performed

---

[1]720 ILCS 5/1-1 *et seq.* (West 2010). The Criminal Code of 2012 (720 ILCS 5/1-1 *et seq.* (West 2012)) postdates Osvaldo's crime.

recklessly. 720 ILCS 5/9-3(a) (West 2010). "Recklessness" is a mental state defined as a conscious disregard of a substantial and unjustifiable risk constituting a gross deviation from the standard of care a reasonable person would exercise in the situation. 720 ILCS 5/4-6 (West 2010). Thus, as applied to Osvaldo, his conviction for involuntary manslaughter means that: (i) he handled the gun in a way that was likely to cause death or great bodily harm to someone; (ii) his handling of the gun showed a conscious disregard of a substantial and unjustifiable risk of great bodily harm; and (iii) his conduct constituted a gross deviation from the standard of care a reasonable person would exercise under similar circumstances.

¶ 22 Allstate's policy looks at the insured's conduct from a slightly different vantage point and excludes claims for bodily injury "which may reasonably be expected to result from the criminal acts or omissions" of the insured. The dissent reasons that because the criminal statute and Allstate's policy exclusion are not identical formulations, Salazar's conviction of the crime of involuntary manslaughter does not preclude him from litigating whether Hieber's death could reasonably be expected to result from his criminal act. But when the trial court in the criminal case found that Salazar's acts were "likely to cause the death" of Hieber and that he was "reckless" for engaging in such acts, that is simply another way of saying that it was reasonable to expect that Hieber's death was likely to result from Salazar's reckless and criminal acts, *i.e.*, precisely the circumstances that trigger the exclusion.

¶ 23 The dissent draws a distinction between an injury resulting from criminally reckless conduct and one "expected" by the insured, contending that the latter requires a showing that the injury was "practically certain" to occur. But each of the cases cited by the dissent regarding the meaning of "expected" under an insurance policy involved policy provisions that required a determination as to whether the injury was expected *from the standpoint of the insured*. See *Farmers Automobile Insurance Ass'n v. Danner*, 2012 IL App (4th) 110461, ¶ 33 (policy provision excluded coverage for bodily injury " 'expected or intended by the insured' "); *Bay State Insurance Co. v. Wilson*, 96 Ill. 2d 487, 491 (1983) (policy did not apply to bodily injury that was "either expected or intended from the standpoint of the insured" (emphases and internal quotation marks omitted)); *American Family Mutual Insurance Co. v. Guzik*, 406 Ill. App. 3d 245, 246 (2010) (coverage excluded for "bodily injury *** caused intentionally by or at the direction of any insured even if the actual bodily injury *** is different than that which was expected or intended from the standpoint of any insured" (emphases and internal quotation marks omitted)). Such provisions necessarily involve an assessment of the insured's subjective mental state. In contrast, under Allstate's criminal acts exclusion, the focus is on whether the consequences of the insured's criminal act are reasonably expected, an analysis that has nothing to do with the insured's subjective beliefs. Thus, Allstate's policy draws no distinction between the insured's "knowing" or "reckless" criminal acts as long as the consequences of those acts are reasonably expected to result. As we discuss below, this calls for an objective rather than a subjective analysis and thus the dissent's focus on Osvaldo's state of mind is misplaced.

¶ 24 Further, we find no significance, for purposes of collateral estoppel, in Osvaldo's decision not to testify in the criminal case. Notwithstanding Osvaldo's exercise of his right to remain silent, he still had the same incentive to litigate the criminal case as the defendant in *Savickas* and the State was required to sustain the same burden of proof beyond a reasonable doubt. Indeed, the *Savickas* court noted that among the rights afforded criminal defendants was the right to remain silent (*Savickas*, 193 Ill. 2d at 385), thus supporting the conclusion that the

insured's exercise of that right, which requires the State to prove its case without the benefit of his testimony, weighs in favor of rather than against the invocation of collateral estoppel. Based on the evidence presented, the trial court found that Osvaldo's acts in waving around a loaded gun were such as were likely to cause death or great bodily harm to some individual, and he performed those acts recklessly. We can see no reason why Osvaldo's decision to refrain from testifying should entitle him to relitigate in this case the issue of his intent and argue that he did not reasonably expect the bodily injury caused by his criminal acts, a conclusion that would be directly contrary to the facts and findings underlying his criminal conviction. Stated differently, we find no equitable considerations compel us to refrain from giving preclusive effect to Osvaldo's criminal conviction. See *Savickas*, 193 Ill. 2d at 391 (finding no potential unfairness to Savickas in according preclusive effect to his criminal conviction, court observed: " 'A criminal defendant receives procedural protections surpassing those accorded any civil litigant, and thus cannot legitimately question the adequacy of the opportunity to litigate or the reliability of the determinations made.' " (quoting Jonathan C. Thau, *Collateral Estoppel and the Reliability of Criminal Determinations: Theoretical, Practical, and Strategic Implications for Criminal and Civil Litigation*, 70 Geo. L.J. 1079, 1089 (1982))).

¶ 25 Even if we agreed that the fact that Osvaldo did not testify should weigh against affording preclusive effect to his criminal conviction, the evidence that Osvaldo claims creates a genuine issue of material fact requiring resolution at trial–his subjective lack of intent to shoot Hieber–is insufficient to defeat Allstate's entitlement to judgment as a matter of law. This is because Allstate's policy, in excluding claims for bodily injury reasonably expected to result from an insured's criminal acts, employs an objective, rather than a subjective, standard by which to gauge the insured's conduct. See *Aetna Casualty & Surety Co. v. Dichtl*, 78 Ill. App. 3d 970, 976 (1979) ("[T]he word 'reasonably' is indicative of an objective standard."); see also *Allstate Insurance Co. v. Brown*, 16 F.3d 222, 226 (7th Cir. 1994) ("[W]e note that we are not the first jurisdiction to interpret the Allstate exclusion at issue here. Many other jurisdictions have addressed the meaning of the intentional or criminal acts exclusion and have found it unambiguous and providing an objective standard. [Citations.]"); *Stinson v. Allstate Insurance Co.*, 441 S.E.2d 453, 454 (Ga. Ct. App. 1994) (if consequences of criminal act are foreseeable by a reasonable person, as opposed to the insured, coverage for injury barred). Thus, accepting as true that Osvaldo did not subjectively intend to injure Hieber and that, as Osvaldo admitted, the gun discharged accidentally, those facts are legally irrelevant in determining whether a reasonable person in Osvaldo's position would reasonably expect that bodily injury would result from his conduct. Because it is obvious that it is reasonable to expect that the act of a person in waving a loaded gun around a group of young people, all of whom had been drinking and some of whom had been abusing prescription drugs and smoking marijuana, will result in injury to someone, Osvaldo's subjective lack of intent to cause Hieber's death cannot avoid the effect of the exclusion.

¶ 26 The parties have not cited nor have we located any reported Illinois decisions construing the criminal acts exclusion in Allstate's homeowners policy. But many courts around the country have applied the same or a similar exclusion under analogous circumstances and the result we reach is in accord with the majority of those reported decisions. In *Brown*, the Seventh Circuit, applying Indiana law, considered an Allstate homeowners policy provision excluding claims for bodily injury "which may reasonably be expected to result from the

intentional or criminal acts of an insured person or which is in fact intended by an insured person." The insured pled guilty to recklessly inflicting serious bodily harm after he shot the victim. The insured denied consciously pulling the trigger of the gun, but conceded that the weapon could not have spontaneously discharged. Granting Allstate's motion for summary judgment, the district court determined that both the intentional and criminal acts exclusions applied and that the insured's subjective intent when he drew the pistol and pointed it at the victim was immaterial. The Seventh Circuit concluded that the exclusion of claims for bodily injury "reasonably expected" did not require the application of a subjective standard, but rather the plain meaning of the provision excluded injuries that are the foreseeable consequence of the insured's criminal act, an objective determination. *Brown*, 16 F.3d at 225-26. The *Brown* court concluded that the district court, employing an objective standard, properly looked "to the predicate acts of [the insured] and the resulting injuries to Brown and determin[ed] that Brown's injuries were the probable, direct and foreseeable consequence of the predicate acts." *Id.* at 226.

¶ 27    The same can be said here. Hieber's death was the "probable, direct and foreseeable consequence" of Osvaldo's conduct in waving a fully loaded gun around a group of people who had been drinking, abusing prescription drugs and smoking marijuana, particularly since the evidence shows that one of the group had already warned Osvaldo about the danger his conduct posed.

¶ 28    Similarly, in *Allstate Insurance Co. v. Burrough*, 120 F.3d 834 (8th Cir. 1997), the Eighth Circuit found that the same exclusion in Allstate's homeowners policy at issue here precluded coverage for the insured minor's conduct in giving a loaded gun, which had previously misfired, to another minor. The initial transferee of the weapon gave it to a third minor who, while "flashing" it out the window of a car, accidentally shot and seriously wounded the victim. Even though the insured minor was never charged criminally or in juvenile court as a result of the shooting, the Eighth Circuit agreed with the district court's determination that by furnishing a deadly weapon to a minor, the insured had nonetheless committed a criminal act. Turning to the "reasonably expected" language of the exclusion, the court found that "[t]he undisputed material facts demonstrate that a reasonable person would have expected [the victim's] injuries to result from the act of furnishing [the initial transferee] with a loaded .22 caliber handgun that had previously misfired." *Id.* at 841. Other courts have likewise determined that the application of the exclusion is amenable to disposition on summary judgment. See *Allstate Insurance Co. v. Gittings*, No. 2:07-cv-1468-RLH-LRL, 2008 U.S. Dist. LEXIS 62508, at *11-13 (D. Nev. Aug. 8, 2008) (accidental discharge of a shotgun resulting in the death of the victim; insured pled guilty to involuntary manslaughter; applying objective standard, court found exclusion applied); *Allstate Insurance Co. v. Cartwright*, Nos. 15472, 15473, 1997 WL 368370, at *4 (Ohio Ct. App. June 27, 1997) (insured and victim riding in car shooting guns from front and rear passenger windows; insured fired gun over victim's shoulder and accidentally shot victim in the hand; insured pled guilty to improperly handling a firearm in a vehicle; court found it "inherently dangerous for one who is only a few feet away from another to aim a gun within inches of the other person's body and to fire it, not to mention doing so in the dark after one has been drinking"); *Allstate Insurance Co. v. Schmitt*, 570 A.2d 488, 492 (N.J. Super. Ct. App. Div. 1990) (insured struck victim in face while holding a glass in his hand; insured, who pled guilty to aggravated assault by recklessly causing bodily injury to another with a deadly weapon, claimed he did not know he was

holding the glass until it shattered; court construed the exclusion "in accordance with the unambiguous language employed, as barring coverage with respect to the reasonably foreseeable consequences of the insured's criminal act"; court further found no public policy precluded issuer of homeowners insurance policy from excluding coverage for injuries that result from criminally reckless conduct (*id.* at 493-94)).

¶ 29     All of the foregoing cases support the conclusion we reach here. *Allstate Insurance Co. v. Zuk*, 574 N.E.2d 1035 (N.Y. 1991), cited by the dissent, is distinguishable on its facts. In *Zuk*, the insured was cleaning and loading a shotgun, which accidentally discharged, killing the victim. The insured later pled guilty to recklessly causing the victim's death. The insured in *Zuk* was not engaging in inherently dangerous or criminal conduct when the gun accidentally discharged. In concluding that it could not be determined as a matter of law that the injury to the victim could reasonably be expected to result from the insured's conduct, the *Zuk* court found that it was possible that a person could undertake a calculated risk, *i.e.*, cleaning and loading a weapon in the presence of others, "*without expecting*–no less reasonably that an accident will occur." (Emphasis in original.) *Id.* at 1038. Further, the court was unwilling to accord preclusive effect to the insured's guilty plea to second degree manslaughter.

¶ 30     Here, Osvaldo's conduct was inherently dangerous and criminal. There is simply no comparison between Osvaldo's conduct and the *Zuk* insured's perfectly legal acts of cleaning and loading a weapon. When an insured waves a fully loaded gun in a group of young people, all whom are under the influence, and does so after being warned of the inherent risk in his conduct, the only conclusion to be drawn is that injury to someone would reasonably be expected to result.

¶ 31     The dissent's further point that there is no evidence regarding how Osvaldo was handling the gun when it fired overlooks the fact that in response to Allstate's motion for summary judgment, neither the Salazars nor Hieber's estate produced this information, but instead relied solely on the transcript of the criminal trial. If the manner in which Osvaldo handled the gun created genuine issues of material fact regarding whether Hieber's injury could reasonably be expected from his criminal act, it was the nonmoving parties' burden to identify those issues and present evidence to support them. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002) ("[I]n order to survive a motion for summary judgment, the nonmoving party must present a factual basis that would arguably entitle the party to a judgment."); *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (2010) (the nonmoving party "must come forth with some evidence that arguably would entitle him to recover at trial"). Because the parties opposing Allstate's motion for summary judgment failed to provide an affidavit or any evidence other than the transcript of the criminal trial, the trial court properly resolved Allstate's motion on that record.

¶ 32     Finally, the decision we reach here does not contravene public policy. Insurance companies are free to enter into contracts with their insureds, which we must enforce according to their terms. *Jeris*, 376 Ill. App. 3d at 1072-73. Unlike automobile policies, no public policy requires homeowners to carry homeowners insurance or carriers to provide the full panoply of coverage under homeowners policies. See *People ex rel. Terry v. Fisher*, 12 Ill. 2d 231, 237 (1957) (referring to Illinois statutes "that confer an interest in such a[n] [automobile liability] policy on every member of the public that is negligently injured"); *Central Mutual Insurance Co. v. Tracy's Treasures, Inc.*, 2014 IL App (1st) 123339, ¶ 103 (noting no public policy requires those who advertise their business through electronic transmissions to carry liability insurance to cover claims by recipients); see also *Schmitt*, 570 A.2d at 494 (rejecting insured's

argument that exclusion violated public policy: "This case involves an exclusion contained in a homeowners policy. We are thus not concerned with legislation involving automobiles or other forms of insurance that must be construed 'with liberality in effecting the broadest protection … of accident victims consistent with the language of the pertinent statute.' [Citation.]"). No identifiable public policy prevents Allstate from refusing to insure the risk of bodily injury reasonably expected as a result of an insured's criminally reckless acts.

¶ 33                                    CONCLUSION

¶ 34     We believe the trial court properly afforded preclusive effect to Osvaldo's criminal conviction after trial. But even if we found otherwise, we would nevertheless affirm summary judgment for Allstate because there exist no genuine issues of material fact regarding whether Hieber's death was, from an objective standpoint, reasonably to be expected as a result of Osvaldo's criminal acts. Accordingly, we affirm the order of the circuit court granting Allstate's motion for summary judgment.

¶ 35     Affirmed.

¶ 36     JUSTICE HYMAN, dissenting.

¶ 37     I find the majority's application of collateral estoppel to be manifestly unfair, contrary to the principles of that doctrine, and against public policy. In addition, I interpret Allstate's policy exclusion to be inapplicable, as it requires at a minimum a crime of "knowledge" rather than "recklessness." Thus, I respectfully dissent. I would reverse the grant of summary judgment and remand for further proceedings.

¶ 38     Allstate's policy excludes coverage for bodily injury "intended by, or which may *reasonably be expected* to result from the intentional or criminal acts or omissions of, any insured person." (Emphasis added.) Allstate and the majority conclude that Osvaldo's criminal conviction for involuntary manslaughter collaterally estops Hieber's estate from litigating the issue of whether Hieber's death was reasonably expected. I could not disagree more.

¶ 39     Collateral estoppel is an equitable doctrine that precludes a party from relitigating an issue decided in an earlier proceeding. *American Family Mutual Insurance Co. v. Savickas*, 193 Ill. 2d 378, 387 (2000). The purpose of the doctrine is to promote judicial economy and prevent repetitive litigation. *Bickel v. Subway Development of Chicagoland, Inc.*, 354 Ill. App. 3d 1090, 1102 (2004). The threshold requirements to the doctrine's application are: (i) the issue presented in the earlier case must be identical to the one presented in the current case; (ii) the earlier case must have received final judgment on the merits; and (iii) the party against whom estoppel is asserted must have been a party or must have been in privity with a party in the earlier case. *Savickas*, 193 Ill. 2d at 387. Moreover, the application of the doctrine must not result in any unfairness to the estopped parties; they must have had a full and fair opportunity and incentive to present their case in the earlier suit. *Id.* at 388.

¶ 40     Two of the collateral estoppel requirements are not met: (i) the relevant issues between the criminal and insurance cases are not identical; and, besides, (ii) Osvaldo's invocation in the criminal proceeding of his fifth amendment right not to testify precluded his opportunity to litigate whether Hieber's death was reasonably expected.

¶ 42          Involuntary manslaughter is a crime of recklessness. See 720 ILCS 5/9-3 (West 2010). Recklessness is not identical to the "reasonably expected" standard in Allstate's policy, thus precluding any estoppel effect. See *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 390-91 (2001) ("Application of the doctrine of collateral estoppel must be narrowly tailored to fit the precise facts and issues that were clearly determined in the prior judgment.").

¶ 43          The majority cites to several foreign cases that have held a crime of recklessness means that an injury was reasonably expected. *Supra* ¶¶ 26-29. New York courts have held the opposite. *Allstate Insurance Co. v. Zuk*, 574 N.E.2d 1035 (N.Y. 1991); *Green v. Allstate Insurance Co.*, 576 N.Y.S.2d 639 (N.Y. App. Div. 1991); *Trafalski v. Allstate Insurance Co.*, 688 N.Y.S.2d 448 (N.Y. App. Div. 1999). Regardless of how other jurisdictions have decided the issue, this court must follow the rulings in *American Family Mutual Insurance Co. v. Savickas*, 193 Ill. 2d 378 (2000), and *Metropolitan Property & Casualty Insurance Co. v. Pittington*, 362 Ill. App. 3d 220 (2005)–two rulings the majority does not faithfully apply.

¶ 44          In *Savickas*, the insured was convicted of first degree murder, and the victim's estate filed suit against the insured. *Savickas*, 193 Ill. 2d at 380. The insured tendered the suit to his insurer, whose policy excluded "bodily injury or property damage 'which is expected or intended by any insured.' " *Id.* at 381. The Illinois supreme court applied collateral estoppel because the issues in the criminal case and insurance case were exactly identical:

> "By finding [the insured] guilty of first degree murder the jury necessarily found him either to have intended to kill the victim, or at least to have known that his acts created a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(1), (a)(2) (West 1992). This finding establishes that he 'intended or expected' the result of his actions, the issue in the declaratory judgment action." *Id.* at 388.

The *Savickas* court drew a direct connection between the insured's mental state as defined in his conviction for first degree murder (intent or knowledge) and the mental state in the policy's exclusion (intent or expectation). *Id.* No similar connection exists here.

¶ 45          As already mentioned, involuntary manslaughter (as opposed to first degree murder) is a crime of recklessness. 720 ILCS 5/9-3(a) (West 2010). "Recklessness" is a mental state defined as a conscious disregard of a substantial and unjustifiable risk constituting a gross deviation from the standard of care a reasonable person would exercise in the situation. 720 ILCS 5/4-6 (West 2010). Osvaldo's recklessness does not indicate that Hieber's injury was "reasonably expected."

¶ 46          In reaching this conclusion, I follow our holding in *Metropolitan Property & Casualty Insurance Co. v. Pittington*, 362 Ill. App. 3d 220 (2005). In *Pittington*, while the insured cleaned a loaded shotgun, the weapon discharged and injured a person. *Id.* at 222. The insured was charged with attempted murder, aggravated battery with a firearm, and unlawful possession of a firearm without a firearm owner's identification card, but he accepted a deal and pleaded guilty to reckless conduct (720 ILCS 5/12-5 (West 2000)). *Pittington*, 362 Ill. App. 3d at 222. The injured person sued the insured, who tendered the suit to his homeowner's insurance company. *Id.* The insurance company filed a declaratory judgment action and the trial court granted the insurance company summary judgment. *Id.* at 222-23. The appellate court reversed, holding that the insured's plea had no collateral estoppel effect in the insurance coverage case. *Id.* at 227-28.

¶ 47    Like here, the *Pittington* policy excluded coverage for injury that " 'may reasonably be expected to result from' " the criminal acts of the insured. *Id.* at 224. Unlike in *Savickas*, the *Pittington* court held that the dubious connection between the insured's criminal mental state (recklessness) and the mental state in the policy exclusion (expected) did not merit application of the collateral estoppel doctrine:

> "In pleading guilty to reckless conduct, [the insured] admitted he performed an act that caused the harm or endangered the safety of [the injured claimant] with 'conscious disregard' of a substantial and unjustifiable risk. [Citation.] [The insured's] plea is in no way an admission that he expected, anticipated or intended to cause bodily harm to [the injured person] and, therefore, cannot meet the first part of the *Savickas* estoppel test." *Id.* at 227.

¶ 48    Allstate and the majority attempt to distinguish *Pittington* on the basis that in *Pittington* the insured took a plea deal. Indeed, the *Pittington* court did say collateral estoppel does not apply unless the criminal conviction was a "struggle to the finish." (Internal quotation marks omitted.) *Id.* at 228. That, however, does not render inapplicable the court's reasoning for differentiating conduct where injury was reasonably expected from reckless conduct. *Pittington*, 362 Ill. App. 3d at 227 (citing 720 ILCS 5/12-5, 4-6 (West 2000)).

¶ 49    This case boils down to a clash between the terms "expected injury" and "reckless conduct." "Expected injury" is not synonymous or interchangeable with "reckless conduct," and the distinction underscores the essential fallacy of the majority's argument (see *supra* ¶ 22)–the terms refer to two mutually exclusive mental states.

¶ 50    In the insurance context, an injury is "expected" when "*practically certain* to be caused by the conduct." (Emphasis added.) *Farmers Automobile Insurance Ass'n v. Danner*, 2012 IL App (4th) 110461, ¶ 34 (policy excluded bodily injury expected or intended by the insured); *Bay State Insurance Co. v. Wilson*, 96 Ill. 2d 487, 494 (1983) (same); *American Family Mutual Insurance Co. v. Guzik*, 406 Ill. App. 3d 245, 248 (2010) (same). "Practical certainty" is only met where a crime is committed "knowingly." Under the Criminal Code of 1961, the definition of "knowledge" provides, "A person knows, or acts knowingly or with knowledge of *** [t]he result of his or her conduct *** when he or she is consciously aware that that result is *practically certain* to be caused by his conduct." (Emphasis added.) 720 ILCS 5/4-5(b) (West 2010).

¶ 51    In contrast, "reckless conduct" does not rise to the level of "practical certainty," because, as already noted, it requires a conscious disregard of a substantial and unjustifiable risk. 720 ILCS 5/4-6 (West 2010). As the Illinois Supreme Court has recognized, "recklessness and knowledge are mutually inconsistent culpable mental states." *People v. Fornear*, 176 Ill. 2d 523, 531 (1997).

¶ 52    If Osvaldo had killed Hieber knowingly, he would be guilty of first degree murder. See 720 ILCS 5/9-1(a)(1), (a)(2) (West 2010) ("A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death *** he *** *knows* that such acts will cause death to that individual or another; or *** he *knows* that such acts create a strong probability of death or great bodily harm to that individual or another ***." (Emphases added.)). "The key difference between first degree murder and involuntary manslaughter is the mental state: acting while *knowing* of a strong probability of death or great bodily harm versus acting *recklessly*." (Emphases in original.) *People v. Kibayasi*, 2013 IL App (1st) 112291, ¶ 42. In applying the collateral estoppel doctrine, the majority treats

Osvaldo's conviction for involuntary manslaughter as it would a conviction for first degree murder. The criminal court condemned Osvaldo for one crime, and this court condemns him for a different one.

¶ 53    While Osvaldo's criminal conviction establishes that he disregarded a substantial and unjustifiable risk of great bodily harm, "[a] person may engage in behavior that involves a calculated risk without expecting–no less reasonably–that an accident will occur. Such behavior, which may be reckless for criminal responsibility purposes, does not necessarily mean that the actor reasonably expected the accident to result [citations]." *Allstate Insurance Co. v. Zuk*, 574 N.E.2d 1035, 1038 (N.Y. 1991); *Commonwealth v. Levesque*, 766 N.E.2d 50, 59 (Mass. 2002) ("Although it is true that recklessness must involve an intentional act or omission, a finding of recklessness is grounded in intent to engage in the reckless conduct, and not intent to bring about the harmful result.").

¶ 54    The majority draws an artificial distinction by attempting to distinguish Illinois cases that define an "expected" injury as "practically certain," by arguing that those cases look to the subjective intent of the insured, while Allstate's policy does not. *Supra* ¶ 23. Whether a policy excludes an injury that is subjectively or objectively "expected" does not alter the definition of "expected." Needless to say, where a policy does not define a term, courts give the word its plain, ordinary, and generally accepted meaning. *Continental Casualty Co. v. Donald T. Bertucci, Ltd.*, 399 Ill. App. 3d 775, 780 (2010). Nothing in the case law supports the majority's position that the plain, ordinary, and generally accepted meaning of an "expected injury," somehow shifts from policy to policy when referencing subjectivity in some policies and objectivity in others.

¶ 55    Accordingly, Osvaldo's conviction for a crime of recklessness does not preclude litigation over the issue of whether Hieber's death was reasonably expected.

¶ 56    Moreover, the facts established in Osvaldo's criminal case are insufficient to determine–as a matter of law–whether Hieber's death was reasonably expected. See *People v. Tenner*, 206 Ill. 2d 381, 396 (2002) (holding collateral estoppel applies when "some controlling fact or question material to the determination of both causes has been adjudicated" (internal quotation marks omitted)). As Barragan testified in the State's case, he did not see how Osvaldo was holding or handling the gun when it discharged. Only Osvaldo himself might know how the gun was being handled when it went off, and the question of whether Hieber's death was reasonably expected hinges on what Osvaldo was doing with the gun at the time of discharge, not before. Because Osvaldo exercised his constitutional right not to testify, the record in the criminal case does not indicate how he was handling the gun when it fired. This factual void must be filled in the insurance case.

¶ 57    The majority contends the State had the same burden of proof and Osvaldo had the same incentive to litigate his criminal case as the defendant in *Savickas* (*supra* ¶ 24), but that is beside the point. The State will always have the same burden of proof in a criminal case, but that burden has no legal significance in determining whether application of the collateral estoppel doctrine is equitable. As for Osvaldo's incentive to litigate the criminal case, again, that has a different legal significance for present purposes. A criminal defendant's refusal to testify in a criminal case will not always bear the same import in determining whether the conviction has any preclusive effect. In Osvaldo's case, it certainly does not mean that the majority can explain what happened for him.

¶ 58 The necessity of Osvaldo's testimony is reinforced by the majority's attempt to distinguish *Allstate Insurance Co. v. Zuk*, 574 N.E.2d 1035 (N.Y. 1991). *Supra* ¶ 29. The majority surmises that the action of the insured in *Zuk*–cleaning a loaded gun in the presence of others–is "perfectly legal" and therefore different from the way Osvaldo handled the gun. *Supra* ¶ 30. But in *Zuk*, the court knew what the insured was doing when the shotgun discharged. We do not know what Osvaldo was doing–a telling and vital distinction. The purpose of collateral estoppel is to promote judicial economy, and not–as the majority applies it–to cut off the court's truth finding role.

¶ 59 The majority incorrectly argues that Hieber's estate, as the nonmoving party, had the burden to show the presence of an issue of material fact. *Supra* ¶ 31. The burden on summary judgment does not shift to the nonmoving party until the movant shows that there are no issues of material fact and that it is due judgment as a matter of law. See *Hall v. Burger*, 277 Ill. App. 3d 757, 761 (1996) ("the party opposing the motion [for summary judgment] need not file any counteraffidavits to create a material question of fact unless the movant presents evidence which precludes any possible liability"); *Ulm v. Memorial Medical Center*, 2012 IL App (4th) 110421, ¶ 16 ("The burden of proof and the initial burden of production in a motion for summary judgment lie with the movant." (Internal quotation marks omitted.)); *Triple R Development , LLC v. Golfview Apartments I, L.P.*, 2012 IL App (4th) 100956, ¶ 12 ("Once the movant has met its initial burden of production, the burden shifts to the nonmovant."). Allstate failed to show that the facts from Osvaldo's criminal case–when liberally construed in favor of Hieber's estate–conclusively show that Hieber's death was reasonably expected. At the very least, reasonable persons can draw divergent inferences from the factual gap left from Osvaldo's exercise of his Fifth Amendment right. See *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 424 (1998) ("where reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact"). Accordingly, the trial court should have denied Allstate's motion for summary judgment.

¶ 60 In the end, it may well be that Hieber's death was reasonably expected, but that cannot be decided as a matter of law on this record.

¶ 61                                                    Unfairness

¶ 62 I believe the majority's application of the collateral estoppel doctrine is manifestly unfair.

¶ 63 Even with the threshold elements of the doctrine met, courts will not apply collateral estoppel to preclude relitigation "unless it is clear that no unfairness results to the party being estopped." *Village of Crestwood v. Ironshore Specialty Insurance Co.*, 2013 IL App (1st) 120112, ¶ 3. It is objectively unfair to estop a party from relitigating an issue it had no incentive to litigate in the earlier proceeding. *Savickas*, 193 Ill. 2d at 388. The State charged Osvaldo with a crime of recklessness and hence, Osvaldo had no incentive to prove that he did not act knowingly, the equivalent standard in Allstate's policy.

¶ 64 Alternatively, the majority's application constitutes non-mutual offensive collateral estoppel. Our supreme court has cautioned against indiscriminately applying nonmutual offensive collateral estoppel. *Herzog v. Lexington Township*, 167 Ill. 2d 288, 295-96 (1995). Unlike the doctrine of collateral estoppel in which a court's decision on an issue of fact or law necessary to a final judgment is deemed conclusive in a later proceeding involving a party to the earlier litigation, under the doctrine of nonmutual offensive collateral estoppel, a nonparty

- 14 -

to the earlier case makes "offensive" use of collateral estoppel against a party to the earlier case. *Id.*

¶ 65 As the *Savickas* court noted, this type of preclusion "could be unfair to the defendant *** if the defendant had more beneficial procedural opportunities available in the second suit which could readily change the result." *Savickas*, 193 Ill. 2d at 390. Because Osvaldo opted not to testify in his criminal trial, no evidence exists as to how he handled the gun at the time of discharge. His testimony may alter the result affirmed by the majority. We do not know whether Osvaldo had a finger on the trigger when it suddenly and unexpectedly discharged, or had the gun playfully pointed at Hieber's back.

¶ 66 Thus, I believe application of the collateral estoppel doctrine is inequitable.

¶ 67 Public Policy

¶ 68 Lastly, I consider the majority's reading of Allstate's policy to be contrary to the public policy of our state. In Illinois, public policy requires that we construe insurance policies in accordance with the "objectively reasonable expectations of the insured." (Internal quotation marks omitted.) *Crawford Laboratories, Inc. v. St. Paul Insurance Co. of Illinois*, 306 Ill. App. 3d 538, 544 (1999); see *Hoglund v. State Farm Mutual Automobile Insurance Co.*, 148 Ill. 2d 272, 279 (1992).

¶ 69 It is objectively reasonable to expect homeowner's insurance to provide coverage where an insured accidently injures someone, as here. By reading the word "expected" to exclude accidental injuries resulting from reckless conduct, the majority contravenes the reasonable expectation of coverage and the scope of the policy's intended coverage. See *General Star Indemnity Co. v. Lake Bluff School District No. 65*, 354 Ill. App. 3d 118, 127 (2004) ("Policy language must be read with reference to the facts at hand and in conjunction with the insured's reasonable expectations and the policy's intended coverage."). Accordingly, the public policy of this State dictates a reversal.

¶ 70 Accordingly, I would reverse the grant of summary judgment and remand to the circuit court for further proceedings.