In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 24-1217 and 24-1223

GRIFFITH FOODS INTERNATIONAL INC., *et al.*,

*Plaintiffs-Appellees*,

*v.*

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,

*Defendant-Appellant*.

———————————

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
Nos. 1:21-cv-06403 & 1:21-cv-04581 — **Mary M. Rowland,** *Judge.*

———————————

ARGUED SEPTEMBER 25, 2024 — DECIDED APRIL 11, 2025

———————————

Before SCUDDER, ST. EVE, and KIRSCH, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Before us is an important question of Illinois law about the meaning and scope of the pollution exclusion in standard-form commercial general liability policies. The exclusion owes its existence to the confounding risk of liability insurance companies faced in recent decades stemming from highly publicized environmental disasters (like the Love Canal crisis in Niagara Falls, New York and the

Times Beach catastrophe in Missouri). In its 1997 decision in *American States Insurance Co. v. Koloms*, 687 N.E.2d 72 (Ill. 1997), the Illinois Supreme Court carefully recounted this history and interpreted the standard CGL pollution exclusion to exclude coverage for bodily injuries caused by traditional environmental pollution (essentially industrial emissions of pollutants), but not by more commonplace emissions—for example, a leak of carbon monoxide from a residential furnace or excess chlorine in a backyard swimming pool.

This appeal requires us to interpret and apply *Koloms* as part of determining whether an industrial pollutant discharged pursuant to a permit issued by an Illinois regulatory agency constitutes traditional environmental pollution subject to a CGL policy's pollution exclusion. The issue comes to us in an insurance dispute that accompanied highly publicized mass tort litigation arising out of substantial injuries, including cancer, allegedly caused by emissions of ethylene oxide over a 35-year period by Griffith Foods International and later Sterigenics U.S. in the suburban Chicago community of Willowbrook, Illinois.

Our own reading of *Koloms* suggests that the pollution exclusion applies. But a post-*Koloms* decision by an intermediate Illinois appellate court suggests that industrial emissions of a contaminant like ethylene oxide pursuant to a regulatory permit changes the analysis and renders the pollution exclusion not applicable, essentially on the theory that the injury-causing emissions were authorized by law and thus cannot constitute a form of traditional pollution otherwise excluded by a CGL pollution exclusion. So the question is unsettled in Illinois law. Mindful that the answer will have substantial consequences—for this case, others, and indeed the broader

insurance market—we believe the most appropriate path forward is to certify the question to the Illinois Supreme Court, the definitive authority on Illinois law.

**I**

All agree that Illinois law governs this dispute and establishes principles for deciding whether an insurer shoulders a duty to defend. Under those principles, we must compare the insurance policy in question with the underlying complaint an insured calls its insurer to defend. See *Koloms*, 687 N.E.2d at 75. So we begin by relaying the facts as alleged in the underlying complaint—in this case, what the parties refer to as the Master Complaint. See Plaintiffs' Fourth Amended Master Compl., *In re Willowbrook Ethylene Oxide Litig.*, No. 2018-L-010475 (Ill. Cir. Ct. filed Apr. 16, 2021).

In 2018 the U.S. Department of Health and Human Services released a public report revealing that Willowbrook, Illinois was experiencing "staggering and disproportionate" rates of cancer. MC ¶ 11. The believed cause: ethylene oxide, or EtO, emissions from a local medical supply sterilization plant opened by Griffith Foods and subsequently operated by Sterigenics. While this was the first that Willowbrook residents had heard of the toxic emissions, the companies' role in driving the excessive cancer rates allegedly began decades earlier.

In the early 1900s Griffith pioneered the use of EtO as an effective medical supply sterilant. MC ¶ 33. Griffith continued its sterilization business for years, and in 1984 sought a construction and operating permit from the Illinois Environmental Protection Agency to open a plant in Willowbrook. MC ¶¶ 33, 40. In its communications with the IEPA about the

requested permit, Griffith informed the agency that its sterilization process produced significant EtO emissions that would be discharged into the air surrounding the plant. MC ¶¶ 39, 41. While the IEPA expressed concerns about the projected EtO emissions, it ultimately granted Griffith's request for a permit. MC ¶¶ 42, 44–45, 48, 57. And, as far as we can tell from the Master Complaint, the permit did not specify or otherwise limit the amount of EtO that Griffith could emit from its Willowbrook sterilization operations.

The Master Complaint alleged that Griffith proceeded to emit substantial and dangerous amounts of EtO while operating the plant from 1984 to 1999. MC ¶ 13, 143. When Sterigenics purchased the facility in 1999, it continued to emit EtO until shutting down in 2019, after the IEPA imposed a specific limit on the plant's EtO emissions. MC ¶¶ 4, 24, 210–14.

The gravamen of the Master Complaint is clear: for the 35 years the sterilization plant operated in Willowbrook, local residents unknowingly inhaled EtO on a regular and continuous basis, with many individuals coming to experience a range of illnesses, including cancer and other serious diseases. See, *e.g.*, MC ¶¶ 10, 13, 90–91, 300(a).

For much of that time, Willowbrook residents lacked information to connect their ailments to the sterilization plant's emissions. *Id.* But in the wake of the 2018 governmental report and floodtide of publicity that followed, over 800 people filed individual lawsuits against Griffith and Sterigenics in Illinois state court, asserting various claims under Illinois law. The complaints commonly alleged that Griffith intentionally located and operated its facility in a residential area despite knowing that its dangerously high EtO emissions would migrate to areas near the facilities, including to homes and

neighboring schools, and eventually cause bodily injuries. To ease the administration of such a high volume of cases, the state court consolidated the matters for pre-trial and discovery purposes only, leading to the plaintiffs collectively producing the single Master Complaint.

Significant satellite insurance litigation commenced alongside the tort litigation. National Union Fire Insurance Company had issued commercial general liability insurance to Griffith over a two-year period, with one policy providing coverage between September 30, 1983 and September 30, 1984, and a second materially identical policy covering the following year and expiring on September 30, 1985. Each CGL policy requires National Union to "defend any suit against the insured seeking damages on account of … bodily injury" that "occur[ed] during the policy period" and "personal injury" arising out of "offenses committed during the policy period." The policies also contain an identical standard-form "pollution exclusion," which bars coverage for bodily injuries arising from the discharge of various pollutants, including toxic chemicals, into the atmosphere, unless the discharge was sudden and accidental.

In 2021 Griffith invoked the policies and demanded that National Union defend it in the ongoing Illinois litigation. National Union denied coverage and refused to defend. This litigation followed, with Griffith and Sterigenics separately going to federal court in Chicago and seeking declarations that National Union had a duty to defend the companies against the state court tort litigation. The two cases proceeded before the same district judge and, as we often see, the parties filed cross motions for judgment on the pleadings to resolve

whether National Union had a duty to defend Griffith and Sterigenics based on the allegations in the Master Complaint.

The district court answered that question in the affirmative, applying Illinois law and determining that the Master Complaint's factual allegations could be read to trigger coverage for both bodily and personal injuries. The district court further concluded that the pollution exclusion did not apply because the companies emitted EtO pursuant to a permit issued by the IEPA. The district court reached this latter conclusion by applying *Erie Insurance Exchange v. Imperial Marble Corp.*, 957 N.E.2d 1214 (Ill. App. Ct. 2011), an Illinois intermediate appellate court decision finding it ambiguous whether a CGL policy's pollution exclusion bars coverage for emissions authorized by regulatory permit.

The district court resolved several other issues challenged on appeal, but we limit our discussion here to National Union's challenge to the district court's ruling on the pollution exclusion to the CGL's coverage for bodily injuries. If the pollution exclusion applies, Griffith and Sterigenics have no claim to coverage and no basis for requiring National Union to defend them against the allegations in the Master Complaint. Put more directly, the answer to the pollution exclusion question may eliminate all other issues pressed by National Union on appeal.

## II

Before reaching the heart of the question we ultimately certify to the Illinois Supreme Court, we address National Union's contention that the district court committed a broad legal error in its duty to defend ruling.

The error, National Union tells us, has major ramifications and came when the district court concluded that it owed Griffith and Sterigenics a duty to defend against the Master Complaint without then taking the necessary second step of discerning the scope of that duty. That second step was necessary, National Union urges, because, while the Master Complaint encompasses 35 years of alleged injuries (from 1984 to 2019), its CGL insurance policies extended coverage for just two years (from 1983 to 1985). Given this substantial mismatch (between the scope of the Master Complaint—which, recall, is a compendium of allegations in the 800 or so individual underlying complaints—and the scope of the insurance policies), National Union says it cannot possibly be on the hook for the entirety of the companies' costs incurred in defending the Master Complaint. The only way to determine and ultimately monetize its duty to defend, it insists, is to take some step to examine the 800 complaints used to create the Master Complaint—itself just a procedural tool to facilitate consolidated pretrial proceedings on common issues—and determine which ones contained allegations of injuries occurring between September 30, 1983 and September 30, 1985, the effective dates of National Union's policies.

National Union's contention has a lot to it, and very well may have prevailed had it been presented this way in the district court. But that never happened. Indeed, National Union waived the position in the district court.

The record leaves little doubt on the point. In response to Griffith's and Sterigenics's motions for judgment on the pleadings, National Union did not respond with a clear and express articulation of the position it presses on appeal. Take, for example, the briefs National Union filed on the Rule 12(c)

motions for judgment on the pleadings. Each refers only to one "Underlying Litigation" and directs the district court to consider the allegations in the Master Complaint. The briefs do not go the next step of explaining National Union's argument on appeal: that the motions were limited to threshold issues of coverage, leaving the more case-by-case issue of occurrence dates, which would require examination of each of the 800 underlying complaints, for a future judgment on the pleadings motion.

Not so, says National Union, because it included a footnote within its opposition to the companies' Rule 12(c) motions stating that the insurer "accept[ed] the plaintiffs' allegations only for the purposes of this motion" but reserved the "right to argue whether plaintiffs sustained 'bodily injury' caused by an 'occurrence' within the effective dates of the Policies." This footnote, though, fell short of clearly alerting the district court to National Union's position regarding the Master Complaint's role in determining the scope of its duty to defend. It asks too much of the district court to read that footnote and conclude that resolution of National Union's duty to defend required *both* evaluating the allegations in the Master Complaint *and* then—at a second step—analyzing each of the underlying 800 individual complaints to determine when each plaintiff's alleged injury occurred. See *Harmon v. Gordon,* 712 F.3d 1044, 1053 (7th Cir. 2013) (explaining that "[w]e have often said that a party can waive an argument by presenting it only in an undeveloped footnote"). At the very least, National Union's footnote left its position so opaque and underdeveloped as to amount to waiver. See, *e.g., Puffer v. Allstate Ins. Co.,* 675 F.3d 709, 718 (7th Cir. 2012) ("[E]ven arguments that have been raised may still be waived on appeal if they are underdeveloped, conclusory, or unsupported by law.").

We also recognize that National Union reacted to the district court's adverse ruling by attempting to relitigate the duty to defend issue. It did so by filing what it styled as a "status report" with the district court, asserting for the first time with any clarity that additional issues, such as the dates each individual plaintiff lived in Willowbrook, needed to be resolved before applying the district court's duty to defend ruling to the various individual state lawsuits.

This change of course was the epitome of too little, too late. On our reading of Sterigenics's and Griffith's motions for judgment on the pleadings, National Union had fair notice that the companies were treating the individual lawsuits as if they had all folded into and become governed by the Master Complaint. If that impression is off, National Union did nothing to clarify its position. The time for National Union to challenge the scope of its duty to defend by narrowing the relevant time period was *before* the district court granted judgment on the pleadings for the companies. Cf. *RCBA Nutraceuticals, LLC v. ProAmpac Holdings, Inc.*, 108 F.4th 997, 1005 (7th Cir. 2024) ("A party may not raise an argument for the first time in a motion for reconsideration."). National Union failed to do so.

We have taken pains with this part of the analysis because National Union's concern of overstated duty to defend liability has much to say for itself and has given us great pause. But, in our final analysis, no matter how many times we review what transpired below, we return to the same conclusion: National Union failed to preserve its contention in the district court.

## III

That brings us to the crux of the issue we confront in this opinion—whether National Union owes a duty to defend Griffith and Sterigenics against the Master Complaint. Illinois courts interpret an insurer's duty to defend broadly. If the factual allegations in the Master Complaint fall "within or *potentially* within" the policies' scope of coverage, we must conclude that National Union has a duty to defend "even if the allegations are groundless, false, or fraudulent." See *United States Fid. & Guar. Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 930 (Ill. 1991); accord *United Fire & Cas. Co. v. Prate Roofing & Installations, LLC*, 7 F.4th 573, 579–80 (7th Cir. 2021) (applying Illinois law).

Two dimensions of coverage are relevant to this appeal: National Union agreed to defend all suits against its insured seeking damages on account of (A) personal injury and (B) bodily injury. We address each in turn.

### A

As relevant here, the policies define personal injury as the "wrongful entry or eviction or other invasion of the right of private occupancy." Griffith and Sterigenics contend that a private nuisance claim falls within that definition. For purposes of this appeal, we will assume that is so. But even on that assumption, we cannot read the Master Complaint, which everyone acknowledges contains no express claim for private nuisance, as pleading facts sufficient to raise the possibility of such a claim. See *Lexmark Int'l, Inc. v. Transp. Ins. Co.*, 761 N.E.2d 1214, 1221 (Ill. App. Ct. 2001) (explaining that courts look to "whether the alleged conduct arguably falls within at least one of the categories of wrongdoing listed in

the policy," giving little weight to the "legal label that characterizes the underlying allegations").

Under Illinois law, a "private nuisance is a substantial invasion of another's interest in the use and enjoyment of his or her land." *In re Chi. Flood Litig.*, 680 N.E.2d 265, 277 (Ill. 1997); see also *Dobbs v. Wiggins*, 929 N.E.2d 30, 39 (Ill. App. Ct. 2010) ("An invasion constituting a nuisance can include noise, smoke, vibration, dust, fumes, and odors produced on the defendant's land and impairing the use and enjoyment of neighboring land."); *Schiller v. Mitchell*, 828 N.E.2d 323, 329 (Ill. App. Ct. 2005) ("The interference must consist of an invasion by something perceptible to the senses.").

While geographically focused on the residents and community of Willowbrook, the Master Complaint contains no allegations that the EtO emissions affected the way the sterilization plant's neighbors used or enjoyed their property. Indeed, to read the Master Complaint as potentially bringing a private nuisance claim (even if not expressly) would be at odds with the entire thrust of the underlying plaintiffs' allegations, which describe "invisible" and "odorless" emissions that Willowbrook residents "unknowingly" inhaled. MC ¶¶ 8, 10. We cannot see how the emissions were simultaneously unknown to residents yet substantially invaded the use and enjoyment of their property. At the very least, having reviewed the Master Complaint in great depth, we see insufficient factual allegations supporting a claim to recover for any loss of use and enjoyment of property—the lynchpin of any claim for private nuisance. The point need not detain us further.

B

So that brings us to the Master Complaint's allegations of bodily injury and, by extension, the CGL policy's pollution exclusion. All agree that the Master Complaint contains allegations of bodily injuries. See, *e.g.*, MC ¶¶ 7, 13, 221, 226.

Under National Union's CGL insurance policies, bodily injuries are not covered if they fall within the scope of the standard-form pollution exclusion, which bars coverage for:

> bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental[.]

Pointing to the last clause, Griffith and Sterigenics invite us to avoid deciding whether its conduct falls within this exclusion because at least some of its EtO emissions were "sudden and accidental." But the plain focus of the Master Complaint belies such a theory. The Illinois Supreme Court has explained that the sudden-and-accidental exception "applies to unexpected and unintended releases of pollutants." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1221 (Ill. 1992). Yet the Master Complaint repeatedly alleges that Griffith and Sterigenics "intentionally," and therefore, expectedly, "emitted EtO into the air despite their knowledge that it would contact people who lived or worked near the facilities." See, *e.g.*, MC ¶¶ 9, 35, 81(j), 90, 153, 313.

That some emissions may have been the result of frequent accidental spills or other negligent business acts does not change the analysis or our conclusion that the sudden-and-accidental exception to the pollution exclusion finds no application here. See *Fruit of the Loom, Inc. v. Travelers Indem. Co.*, 672 N.E.2d 278, 287–88 (Ill. App. Ct. 1996) (concluding that the sudden-and-accidental exception did not apply because "accidental spills" occurred "in the ordinary course of business"). What this means by extension, then, is that if the pollution exclusion applies, National Union does not owe Griffith and Sterigenics a duty to defend against the Master Complaint.

Griffith and Sterigenics nevertheless insist that the EtO emissions alleged in the Master Complaint do not fall under the pollution exclusion as interpreted by the Illinois Supreme Court because it is possible the emissions do not constitute "traditional environmental pollution." National Union sees the question the opposite way, telling us that this case presents a postcard example of where the pollution exclusion should apply to bar coverage for the bodily injuries alleged in the Master Complaint. With their positions staked out, both sides recognize that the answer turns on how to apply the Illinois Supreme Court's reasoning in *American States Insurance Co. v. Koloms* to the allegations in the Master Complaint. See 687 N.E.2d 72.

We, too, see *Koloms* as standing centerstage in this dispute, for the decision interprets Illinois law, comes from the State's highest court, and supplies essential guidance on the pollution exclusion within standard-form CGL policies. *Koloms* itself concerned whether injuries caused by carbon monoxide emissions from a defective furnace operating within a

residential home fell within a CGL policy's pollution exclusion for duty to defend purposes. See *id.* at 73. In the course of answering that question in the negative, the Court supplied substantial guidance on the meaning and scope of the standard CGL policy's pollution exclusion.

The Court underscored that the question was challenging—one on which courts across the country had "not reached a clear consensus." *Id*. at 78. Some courts, it observed, strictly construed the exclusion's plain language, finding that it barred coverage in a wide range of scenarios that would not normally be thought of as environmental pollution. See *id*. But other courts held that following the pollution exclusion's plain language would lead to absurd results, like excluding coverage when a person slips and falls on the spilled contents of a bottle of Drano or has an allergic reaction to chlorine in a swimming pool. See *id*. at 77–79 (citing *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992)).

In the end, the Illinois Supreme Court, "troubled" by an "overbreadth in the language of the exclusion as well as the manifestation of an ambiguity which results when the exclusion is applied to cases which have nothing to do with 'pollution' in the conventional, or ordinary, sense of the word," looked beyond the exclusion's plain language. *Id*. at 79. Recounting the "well-documented and relatively uncontroverted" events leading to the insurance industry's adoption of the pollution exclusion, see *id.* (quoting *Morton Int'l, Inc. v. General Accident Ins. Co.*, 629 A.2d 831, 848 (N.J. 1993)), the Court observed that "the predominate motivation in drafting an exclusion for pollution-related injuries was the avoidance of the 'enormous expense and exposure resulting from the

"explosion" of *environmental* litigation.'" *Id.* at 81 (quoting *Weaver v. Royal Ins. Co. of Am.*, 674 A.2d 975, 977 (N.H. 1996)). So to give true meaning to the intent of its drafters, the Court read the pollution exclusion as applying only to "injuries caused by traditional environmental pollution." *Id.* at 82.

We recognize, to be sure, that the pollution exclusion in *Koloms*, unlike the one before us here, lacked an exception for sudden-and-accidental emissions. But that difference is not one the parties make anything of. Nor do we see the difference as having any significance, for the entirety of our reasoning turns on how the Illinois Supreme Court interpreted the core meaning of the pollution exclusion.

So if *Koloms* stood in the Illinois Reports as the only pertinent authority on the question presented, we would hold that the pollution exclusion in the CGL policies at issue here applies to exclude the possibility of coverage for the bodily injuries alleged in the Master Complaint—thereby relieving National Union of any duty to defend Griffith and Sterigenics. The companies operated an industrial sterilization plant and emitted thousands of pounds of EtO into the air of Willowbrook at a time when the exact and full dangers of the chemical remained unclear. Decades later, hundreds of people living and working near the Willowbrook facility alleged that continuously inhaling those emissions caused them to develop cancers and other serious diseases. See, *e.g.*, MC ¶¶ 7, 13, 221. This type of "gradual" and "repeated discharge of hazardous substances into the environment," in our view, stands in stark contrast to the types of routine commercial hazards the *Koloms* Court thought absurd to include within the pollution exclusion. 687 N.E.2d at 81 (emphasis omitted) (quoting *W. Am. Ins. Co. v. Tufco Flooring E., Inc.*, 409 S.E.2d

692, 699 (N.C. Ct. App. 1991)). Instead, what the Master Complaint alleges happened in Willowbrook strikes us as much more reminiscent of the "well-publicized, environmental disasters" of Times Beach and Love Canal that prompted the exclusion's adoption and inclusion in the CGL policies. *Id.* at 80.

But Griffith and Sterigenics implore us to pause and consider an intermediate appellate court decision that came in the wake of and indeed interpreted and applied *Koloms*. That decision is *Erie Insurance Exchange v. Imperial Marble Corp.*, 957 N.E.2d 1214. There a marble manufacturer sought insurance coverage under its CGL policy after nearby residents sued the company for bodily injuries caused by its emission of odorous and toxic chemicals. See *id.* at 1217, 1220. The manufacturer had emitted the chemicals pursuant to a permit issued by the Illinois Environmental Protection Agency but allegedly discharged more than authorized by the permit. See *id.* at 1216–17.

Relying on *Koloms*, the trial court held that the pollution exclusion applied to bar coverage because the emissions were "traditional environmental pollution." See *id.* at 1221. But the Illinois intermediate appellate court, likewise applying *Koloms*, reversed, concluding that the exclusion was "arguably ambiguous as to whether the emission of hazardous materials in levels permitted by an IEPA permit constitute traditional environmental pollution excluded under the [CGL] policy." *Id.* Resolving the ambiguity in the insured-manufacturer's favor, the court held that the insurer had a duty to defend against the underlying claims. See *id.*

To our eye, then, *Imperial Marble* could be read to suggest that legally authorized emissions—those that occur pursuant to a regulatory permit—may not constitute the type of

traditional environmental pollution that *Koloms* envisioned. The decision at least makes that conclusion possible.

Further muddying the waters is one of our own decisions applying Illinois law and interpreting a CGL pollution exclusion but coming after and taking an altogether different view than the one offered by *Imperial Marble*. In *Scottsdale Indemnity Co. v. Village of Crestwood*, an Illinois municipality asserted that its insurer had a duty to defend it against claims for bodily injuries resulting from its mixing of water contaminated with perc into the municipal drinking water. See 673 F.3d 715, 716 (7th Cir. 2012). Citing *Koloms* and undergoing a comprehensive analysis of the standard pollution exclusion in CGL insurance policies, we held that the exclusion applied to bar coverage. See *id.* at 718–21. In doing so, we rejected the municipality's contention that the perc-contaminated drinking water was not pollution "because the amount of perc in the Village's water supply was below the maximum level permitted by environmental regulations." *Id.* For purposes of the pollution exclusion, we explained, all that mattered was that the suits alleged the contaminated water caused the underlying injuries. See *id.*

*Scottsdale*, then, is in line with our own natural reading of *Koloms* but in tension with *Imperial Marble*. In many instances, a circumstance like this would call for us to decide whether to adhere to the reasoning in *Scottsdale* or to shift course and resolve whether *Imperial Marble* aligns with how we believe the Illinois Supreme Court would resolve the question presented. See *Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir. 2015) ("Where the Illinois Supreme Court has not ruled on an issue, decisions of the Illinois Appellate Courts control, unless there are persuasive indications that the Illinois Supreme

Court would decide the issue differently."). Given the importance of how this question is resolved and the uncertainty created by *Imperial Marble*, we are hesitant to take either approach here and believe the best path forward is to afford the Illinois Supreme Court an "opportunity to illuminate a clear path on th[is] issue." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 639 n.18 (7th Cir. 2002) (quoting *In re Badger Lines, Inc.*, 140 F.3d 691, 698–99 (7th Cir. 1998)).

Under Illinois Supreme Court Rule 20, certification to the Illinois Supreme Court is proper if we have before us a question of Illinois law that "may be determinative" of the case, and there are "no controlling precedents" from the Illinois Supreme Court. Ill. Sup. Ct. R. 20(a). That criterion is satisfied here. *Koloms* goes a long way in telling us how to interpret a standard pollution exclusion in a CGL insurance policy, but, underscored by the tension between *Imperial Marble* and *Scottsdale*, the exact scope of traditional environmental pollution remains unclear, and leaves us "genuinely uncertain" as to how to proceed. *In re Hernandez*, 918 F.3d 563, 570 (7th Cir. 2019) ("In exercising our discretion to certify a question, 'the most important consideration is whether we find ourselves genuinely uncertain about a question of state law that is key to a correct disposition of the case.'" (quoting *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 732 F.3d 755, 766 (7th Cir. 2013))).

Further pushing us toward certification is the significance this question has for Illinois insurance law and the broader insurance industry. See *Martin v. Goodrich Corp.*, 95 F.4th 475, 481 (7th Cir. 2024) ("[I]f it is 'an important issue of public concern' and 'likely to recur,' certification is a better bet." (quoting *Cutchin v. Robertson*, 986 F.3d 1012, 1028 (7th Cir. 2021))). Because federal law requires any company that emits large

amounts of pollutants to obtain a permit, see 40 C.F.R. § 71.3, and environmental regulations are constantly evolving, the situation before us is likely to recur and our decision would have substantial ramifications for insurers and insureds alike. The stakes are just as high for the parties in this litigation— how the question is answered may be the difference between $150 million in defense costs and zero.

For these reasons we certify the following question to the Illinois Supreme Court:

> In light of the Illinois Supreme Court's decision in *American States Insurance Co. v. Koloms*, 687 N.E.2d 72 (1997), and mindful of *Erie Insurance Exchange v. Imperial Marble Corp.*, 957 N.E.2d 1214 (2011), what relevance, if any, does a permit or regulation authorizing emissions (generally or at particular levels) play in assessing the application of a pollution exclusion within a standard-form commercial general liability policy?

By framing our question this way, we do not intend to limit the scope of the Illinois Supreme Court's inquiry, and we welcome the Justices to reformulate the question as they see fit.

QUESTION CERTIFIED.