**2026 IL 131710**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

---

(Docket No. 131710)

GRIFFITH FOODS INTERNATIONAL, INC., *et al.*, Appellees,
v. NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,
Appellant.

*Opinion filed January 23, 2026.*

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.

Chief Justice Neville and Justices Theis, Overstreet, Holder White, and O'Brien concurred in the judgment and opinion.

Justice Rochford took no part in the decision.

**OPINION**

¶ 1      This case is before us on a question of Illinois law certified by the United States Court of Appeals for the Seventh Circuit pursuant to Illinois Supreme Court Rule 20 (eff. Aug. 1, 1992). The certified question is:

"In light of the Illinois Supreme Court's decision in *American States Insurance Co. v. Koloms*, 687 N.E.2d 72 (1997), and mindful of *Erie Insurance Exchange v. Imperial Marble Corp.*, 957 N.E.2d 1214 (2011), what relevance, if any, does a permit or regulation authorizing emissions (generally or at any particular levels) play in assessing the application of a pollution exclusion within a standard-form commercial general liability policy?"

¶ 2    For the following reasons, we answer the certified question as follows: a permit or regulation authorizing emissions (generally or at any particular levels) has no relevance in assessing the application of a pollution exclusion within a standard-form commercial general liability policy.

¶ 3                                    BACKGROUND

¶ 4    The appellees, Griffith Foods International, Inc., and its corporate successor, Sterigenics U.S., LLC (the policyholders), brought a consolidated action in the federal district court for the Northern District of Illinois against the appellant, National Union Fire Insurance Company of Pittsburgh, PA (insurer), seeking declarations that the insurer had a duty to defend the policyholders in an underlying mass tort case. The underlying tort litigation arose when residents of Willowbrook, Illinois, alleged that the policyholders had emitted ethylene oxide (EtO) from their medical-equipment sterilization facility for more than 35 years and that these emissions had caused nearby residents to experience a range of illnesses, including cancer and other serious diseases.

¶ 5    The insurer issued two commercial general liability (CGL) policies for the medical sterilization facility covering the period from September 1983 to September 1985. These policies required the insurer to "defend any suit against the insured seeking damages on account of *** bodily injury" that "occur[red] during the policy period" and "personal injury" arising out of "offenses committed during the policy period."

¶ 6    The CGL policies included a standard pollution exclusion, which is the subject of this appeal. The pollution exclusion bars coverage for

"bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water."

¶ 7 When the policyholders sought a declaration that the insurer had a duty to defend them in the underlying tort litigation, the insurer refused to defend based on the pollution exclusion. The federal district court held that the insurer had a duty to defend, ruling that the pollution exclusion in the CGL policies did not apply because the policyholders had emitted the EtO pursuant to a permit issued by the Illinois Environmental Protection Agency (IEPA).

¶ 8 The insurer appealed to the United States Court of Appeals for the Seventh Circuit. *Griffith Foods International Inc. v. National Union Fire Insurance Co. of Pittsburgh*, 134 F.4th 483 (7th Cir. 2025). In its review, the Seventh Circuit noted that this court's decision in *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473 (1997), "stand[s] centerstage in this dispute." *Griffith Foods*, 134 F.4th at 490. The Seventh Circuit explained that *Koloms* "concerned whether injuries caused by carbon monoxide emissions from a defective furnace *** fell within a CGL policy's pollution exclusion for duty to defend purposes." *Id.* Ultimately, as described by the Seventh Circuit, the *Koloms* court "read the pollution exclusion as applying only to 'injuries caused by traditional environmental pollution' " and therefore found that the pollution exclusion did not bar coverage for litigation regarding carbon monoxide emissions from a defective furnace. *Id.* at 491 (quoting *Koloms*, 177 Ill. 2d at 494).

¶ 9 The Seventh Circuit further stated that, if *Koloms* stood as the "only pertinent authority on the question presented, we would hold that the pollution exclusion in the CGL policies at issue here applies to exclude the possibility of coverage for the bodily injuries alleged ***—thereby relieving [the insurer] of any duty to defend [the policyholders]." *Id.* "But [the policyholders] implore us to pause and consider an [Illinois Appellate Court] decision that *** interpreted and applied *Koloms*," *Erie Insurance Exchange v. Imperial Marble Corp.*, 2011 IL App (3d) 100380. *Griffith Foods*, 134 F.4th at 491. The Seventh Circuit explained that, in *Imperial Marble*, the Illinois Appellate Court held that the pollution exclusion was ambiguous as to whether emission of hazardous materials in levels permitted by the

- 3 -

IEPA constitutes traditional environmental pollution in accordance with *Koloms*. *Id.* The appellate court resolved the ambiguity in favor of the policyholders and therefore held that the insurer had a duty to defend against the underlying claims. *Id.*

¶ 10　　The Seventh Circuit continued: "Further muddying the waters is [the Seventh Circuit's decision] applying Illinois law and interpreting a CGL pollution exclusion but coming after and taking an altogether different view than the one offered by *Imperial Marble*," *Scottsdale Indemnity Co. v. Village of Crestwood*, 673 F.3d 715 (7th Cir. 2012). *Griffith Foods*, 134 F.4th at 492. The Seventh Circuit explained that, in *Scottsdale*, it rejected the policyholder's contention that contaminated drinking water was not pollution because the amount of pollutant was below the maximum level permitted by environmental regulation. *Id.* "For purposes of the pollution exclusion, we explained, all that mattered was that the suits alleged the contaminated water caused the underlying injuries." *Id.*

¶ 11　　The Seventh Circuit in this case stated that it was submitting the certified question to this court for clarification because "*Koloms* goes a long way in telling us how to interpret a standard pollution exclusion in a CGL insurance policy, but, underscored by the tension between *Imperial Marble* and *Scottsdale*, the exact scope of traditional environmental pollution remains unclear, and leaves us genuinely uncertain as to how to proceed."[1] (Internal quotation marks omitted.) *Id.*

¶ 12　　This court agreed to answer the certified question. See Ill. S. Ct. R. 20 (eff. Aug. 1, 1992). The following organizations filed *amici* briefs in support of the insurer's position: (1) Zurich American Insurance Company; (2) Swiss Re Corporate Solutions Elite Insurance Corporation; and (3) the American Property Casualty Insurance Association, the Complex Insurance Claims Litigation Association, the National Association of Mutual Insurance Companies, and the Illinois Insurance Association. The following organizations filed *amici* briefs in support of the policyholders' position: (1) the Illinois Trial Lawyers Association; (2) Chemical Industry Council of Illinois and the American Chemistry Council; (3) Vantage

---

[1]We note that, with respect to the underlying tort case out of which the certified question arose, the policyholders settled with the plaintiffs and paid damages; thus only the insurer's duty to defend is before the Seventh Circuit.

Ethylene Oxide Settlement Participants; (4) United Policyholders; and (5) the Illinois Manufacturers' Association, Medline Industries, LP, Vantage Specialty Chemicals, Inc., Sterilization Services of Tennessee, Inc., and iBio. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 13                                             ANALYSIS

¶ 14        The certified question before us is:

> "In light of the Illinois Supreme Court's decision in [*Koloms*], and mindful of [*Imperial Marble*], what relevance, if any, does a permit or regulation authorizing emissions (generally or at any particular levels) play in assessing the application of a pollution exclusion within a standard-form commercial general liability policy?"

¶ 15        Certified questions are questions of law that this court reviews *de novo*. *Martin v. Goodrich Corp.*, 2025 IL 130509, ¶ 11. The certified question also involves the construction of an insurance policy, which presents an issue of law that is similarly reviewed *de novo*. *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 360 (2006).

¶ 16        We begin our analysis by reviewing the cases that prompted the certified question, starting with *Koloms*. In *Koloms*, several employees of a commercial building brought a lawsuit against the building's owners alleging that the owners had negligently maintained a furnace, which had emitted carbon monoxide and other noxious fumes and made them ill. *Koloms*, 177 Ill. 2d at 476. The building's owners sought to have their insurer defend the litigation, but the insurer refused. *Id.* at 476-77. The insurer maintained that coverage was unavailable based on the pollution exclusion in the building owners' CGL policy and, specifically, that the emission of carbon monoxide fumes from the furnace constituted the " 'release' " of a gaseous " 'irritant or contaminant' " within the meaning of the pollution exclusion. *Id.* at 477. Both the trial and appellate courts rejected this argument and concluded that the pollution exclusion language should be construed in favor of coverage. *Id.* at 478.

¶ 17    On appeal, this court affirmed the judgments of the lower courts. *Id.* at 494. In so doing, we reviewed the drafting history of the pollution exclusion in CGL policies. *Id.* at 489. This court noted that, beginning in the 1960s, the United States Congress substantially amended the Clean Air Act (42 U.S.C. § 7401 *et seq.* (1994)) to help protect and enhance the quality of the country's air resources, especially in the wake of major environmental disasters. *Koloms*, 177 Ill. 2d at 490. This court explained that "[t]he passage of these amendments, which included provisions for cleaning up the environment, imposed greater economic burdens on insurance underwriters, particularly those drafting standard-form CGL policies." *Id.* In response, the insurance industry drafted the pollution exclusion into standard CGL policies, with the predominant motivation being the avoidance of the enormous expense resulting from the explosion of environmental litigation. See *id.* at 490-93 (citing *Weaver v. Royal Insurance Co. of America*, 674 A.2d 975 (N.H. 1996)). In light of this drafting history, this court stated: "We would be remiss, therefore, if we were to simply look to the bare words of the exclusion, ignore its *raison d' être*, and apply it to situations which do not remotely resemble traditional environmental contamination." *Id.* at 493. We noted that the pollution exclusion had a "potentially limitless application" but should only apply to those hazards traditionally associated with environmental pollution and nothing beyond. *Id.* at 489.

¶ 18    This court in *Koloms* therefore concluded that the pollution exclusion in CGL policies applies *only* to those injuries caused by "traditional environmental pollution." *Id.* at 494. Based on that reasoning, we held that the accidental release of carbon monoxide due to a broken furnace does not constitute traditional environmental pollution. *Id.* Therefore, the pollution exclusion did not apply under the facts presented in the *Koloms* case, and the insurer had a duty to defend. *Id.*

¶ 19    We next consider *Imperial Marble*, 2011 IL App (3d) 100380. In *Imperial Marble*, the insurer sought a declaration that, because of the pollution exclusion in the policyholder's CGL policy, it had no duty to defend the policyholder in an underlying action alleging injuries caused by emissions from the policyholder's manufacturing facility. *Id.* ¶ 3. Similar to the facts of the underlying case that raises the certified question before us now, the emissions in *Imperial Marble* were authorized under a permit issued by the IEPA. *Id.* ¶ 20. Based on the fact that it held a permit, the policyholder in *Imperial Marble* argued that its emission did not

qualify as pollutants under the pollution exclusion. *Id.* The appellate court concluded that "[t]he policy's pollution exclusion is arguably ambiguous as to whether the emission of hazardous materials in levels permitted by an IEPA permit constitute traditional environmental pollution excluded under the policy" pursuant to *Koloms*. *Id.* ¶ 22. Because ambiguities must be resolved in favor of the policyholder, the appellate court found that the pollution exclusion did not apply and, consequently, the insurer had a duty to defend. *Id.* ¶ 23.

¶ 20        In another case, *Country Mutual Insurance Co. v. Bible Pork, Inc.*, 2015 IL App (5th) 140211, ¶ 41, the appellate court followed *Imperial Marble*'s analysis. Thus, the appellate court there also concluded that the pollution exclusion is ambiguous as to whether the emission of hazardous materials in levels authorized by an IEPA permit is "traditional environmental pollution" as defined in *Koloms*. (Internal quotation marks omitted.) *Id.* The appellate court noted that, when there are ambiguities in an insurance policy, the policy is liberally construed in favor of the policyholder. *Id.* ¶ 38. Accordingly, the appellate court in *Bible Pork* held that the pollution exclusion did not apply to the permitted pollution in that case. *Id.* ¶ 41.

¶ 21        Lastly, we analyze *Scottsdale*, 673 F.3d 715. In *Scottsdale*, insurers sought a declaration that, because of the pollution exclusion, they had no duty to defend the policyholders in underlying lawsuits alleging injuries caused by contaminated groundwater. *Id.* at 716. The policyholders, in response, argued that the pollution exclusion did not apply, in part because the amount of contaminant in the water supply was below the maximum level permitted by environmental regulations and so this was "not a pollution case at all." *Id.* at 721. The Seventh Circuit rejected this argument, stating:

> "either the [contaminant] caused injuries, maybe because the relevant regulations are too lax, or it did not and the tort suits will fail. All that counts is that the suits are premised on a claim that the [contaminant] caused injuries for which the plaintiffs are seeking damages, and that claim triggers the pollution exclusion." *Id.*

Further, the Seventh Circuit stressed that the very nature of the underlying complaints revealed it was a pollution case and that the complaints, which described the nature and effects of the contaminated groundwater in detail, "inadvertently but unmistakably acknowledge[d] the applicability of the pollution exclusion." *Id.* The

Seventh Circuit therefore affirmed the lower courts' holdings that the claims against the policyholders alleging groundwater contamination fell within the scope of the pollution exclusion. *Id.*

¶ 22 With the foregoing cases in mind, we now turn to the certified question before us. The insurer urges us to answer the certified question by holding that a permit or regulation authorizing emissions plays no role in assessing the application of a pollution exclusion within a standard-form CGL policy. The insurer argues that the pollution exclusion does not include an exception for government-authorized toxic emissions, so it is irrelevant that the policyholders had a permit from the IEPA allowing them to emit the emissions at issue in the underlying lawsuits. The insurer asserts that *Koloms*'s review of the drafting history of the pollution exclusion confirms that the exclusion applies to authorized emissions, as it was drafted in response to increasing environmental lawsuits and therefore increasing insurer liability. The insurer also notes that, if we were to rule that the pollution exclusion in CGL policies does not apply to permitted emissions, Illinois would be the first state to reach such a holding.

¶ 23 Conversely, the policyholders urge us to answer the certified question by holding that the pollution exclusion does not relieve the insurer of its duty to defend the policyholders from tort lawsuits alleging injuries arising from the emission of hazardous materials in levels authorized by an IEPA permit. The policyholders argue that, once the IEPA issues a permit authorizing emissions, the IEPA has deemed those emissions to no longer be pollution. Therefore, according to the policyholders, there is at least an ambiguity as to whether those permitted emissions are "traditional environmental pollution" pursuant to *Koloms*. And, because ambiguities must be resolved in favor of the insured, the policyholders contend the pollution exclusion cannot apply. We disagree.

¶ 24 In interpreting an insurance policy, our primary objective is to ascertain and give effect to the intention of the parties, as expressed in the policy language. *Hobbs v. Hartford Insurance Co. of the Midwest*, 214 Ill. 2d 11, 17 (2005). "Undefined terms [in an insurance contract] will be given their plain, ordinary, and popular meaning; *i.e.*, they will be construed with reference to the average, ordinary, normal, reasonable person." (Internal quotation marks omitted.) *Acuity v. M/I Homes of Chicago, LLC*, 2023 IL 129087, ¶ 30. Further, when construing the

language of an insurance policy "we will not strain to find an ambiguity where none exists." *Hobbs*, 214 Ill. 2d at 17.

¶ 25     The plain language of the pollution exclusion states that coverage is barred for litigation involving "the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water." As the Seventh Circuit noted, the discharge of EtO emissions into the atmosphere at issue in this case fits squarely within that plain language. *Griffith Foods*, 134 F.4th at 491. Moreover, the emissions fit squarely within the plain and ordinary meaning of "traditional environmental pollution" (*Koloms*, 177 Ill. 2d at 494) or "pollution harms as ordinarily understood" (*Scottsdale*, 673 F.3d at 717).

¶ 26     The fact that the IEPA permitted the EtO emissions does not change this analysis. The pollution exclusion says *nothing* about permitted or authorized pollution, and courts "must not inject terms and conditions different from those agreed upon by the parties." *State Farm Mutual Automobile Insurance Co. v. Elmore*, 2020 IL 125441, ¶ 23. Further, the IEPA permit did not change the character or substance of the EtO emissions as pollution. Indeed, if the EtO emissions were *not* pollution, there would have been no need for the policyholders to obtain a permit from IEPA in the first place. In other words, the permit allowing the policyholders to emit EtO did not, in some manner, render those emissions no longer pollution in the plain and ordinarily understood meaning of the word.

¶ 27     In addition, as explained by this court in *Koloms*, the pollution exclusion in CGL policies was drafted in response to the insurance industry's concerns about increasing, costly environmental litigation. *Koloms*, 177 Ill. 2d at 492. Declining to apply the pollution exclusion simply because the pollution was *permitted* by the State would undermine the pollution exclusion's very purpose.

¶ 28     The pollution exclusion, standard in CGL policies, specifically precludes coverage for litigation costs arising from pollution harms as ordinarily understood, but that does not mean that coverage is categorically unavailable for claims arising from the discharge of pollutants. We note that insurance companies have developed entirely *separate* pollution liability policies for purchase, which allow the insurers to assess the risk of costly environmental litigation. Without speculating on the

availability of such policies to any particular insureds, we emphasize that these separate policies generally provide the policyholders with coverage for environmental lawsuits.

¶ 29 In sum, in determining whether the pollution exclusion in a CGL policy applies, we hold that it is irrelevant whether the underlying pollution is permitted or not. Rather, as the *Scottsdale* court said: "[a]ll that counts is that the [underlying] suits are premised on a claim that the [emissions] caused injuries for which the plaintiffs are seeking damages, and that claim triggers the pollution exclusion." *Scottsdale*, 673 F.3d at 721. To the extent that *Imperial Marble* and *Bible Pork* are at odds with this conclusion, those decisions are overruled.

¶ 30                                                           CONCLUSION

¶ 31 For the foregoing reasons, we answer the certified question as follows: a permit or regulation authorizing emissions (generally or at any particular levels) has no relevance in assessing the application of a pollution exclusion within a standard-form commercial general liability policy.

¶ 32 Certified question answered.

¶ 33 JUSTICE ROCHFORD took no part in the consideration or decision of this case.